**[J-26A-2018 and J-26B-2018]**

# IN THE SUPREME COURT OF PENNSYLVANIA
## WESTERN DISTRICT

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| PITTSBURGH HISTORY AND LANDMARKS FOUNDATION, A PENNSYLVANIA NON-PROFIT CORPORATION; LANDMARKS FINANCIAL CORPORATION, A PENNSYLVANIA NON-PROFIT CORPORATION; HENRY P. HOFFSTOT, JR.; DAVID E. BARENSFELD; PETER H. STEPHAICH; PATRICK R. WALLACE; ALEXANDER SPEYER; AND HENRY P. HOFFSTOT, III | : : : : : : : : : : : | No. 53 WAP 2017 <br><br> Appeal from the Order of the Commonwealth Court entered April 21, 2017 at No. 113 CD 2016, vacating the Order of the Court of Common Pleas of Allegheny County entered September 21, 2015 at No. GD 13-23355, and remanding. <br><br> ARGUED: April 11, 2018 |
| v. | : : : : | |
| ARTHUR P. ZIEGLER, JR.; MARK S. BIBRO; JACK R. NORRIS; PITTSBURGH HISTORY AND LANDMARKS FOUNDATION, A PENNSYLVANIA NON-PROFIT CORPORATION; AND LANDMARKS FINANCIAL CORPORATION, A PENNSYLVANIA NON-PROFIT CORPORATION | : : : : : : : : : : : | |
| APPEAL OF: ARTHUR P. ZIEGLER JR., MARK S. BIBRO, JACK R. NORRIS, PITTSBURGH HISTORY AND LANDMARKS FOUNDATION AND LANDMARKS FINANCIAL CORPORATION | : : : : : : : | |
| PITTSBURGH HISTORY AND LANDMARKS FOUNDATION, A PENNSYLVANIA NON-PROFIT CORPORATION; LANDMARKS FINANCIAL CORPORATION, A PENNSYLVANIA NON-PROFIT | : : : : : : | No. 54 WAP 2017 <br><br> Appeal from the Order of the Commonwealth Court entered April 21, 2017 at No. 113 CD 2016, vacating the Order of the Court of |

CORPORATION; HENRY P. HOFFSTOT, JR.; DAVID E. BARENSFELD; PETER H. STEPHAICH; PATRICK R. WALLACE; ALEXANDER SPEYER; AND HENRY P. HOFFSTOT, III

:
:
:
:
:
:
:
:
:
:
:

Common Pleas of Allegheny County entered September 21, 2015 at No. GD 13-23355, and remanding.

ARGUED:  April 11, 2018

v.

ARTHUR P. ZIEGLER, JR.; MARK S. BIBRO; JACK R. NORRIS; PITTSBURGH HISTORY AND LANDMARKS FOUNDATION, A PENNSYLVANIA NON-PROFIT CORPORATION; AND LANDMARKS FINANCIAL CORPORATION, A PENNSYLVANIA NON-PROFIT CORPORATION

:
:
:
:
:
:
:
:
:
:
:
:

APPEAL OF: HENRY P. HOFFSTOT, JR.; DAVID E. BARENSFELD; PETER H. STEPHAICH; PATRICK R. WALLACE; ALEXANDER SPEYER; AND HENRY P. HOFFSTOT, III

:
:
:
:
:
:

## OPINION

**JUSTICE BAER**                    **DECIDED:  JANUARY 23, 2019**

Before this Court are questions involving the applicability of the attorney-client privilege in a corporate derivative action lawsuit brought by former board members of two nonprofit corporations against current board members.  As explained more fully herein, we respectfully reject, for purposes of proceedings related to a motion to dismiss derivative litigation, the Commonwealth Court's adoption of a qualified attorney-client privilege as set forth in *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), which we view as inconsistent with our prior caselaw emphasizing predictability in the application of the attorney-client privilege.  We, however, affirm the Commonwealth Court's decision

not to apply the fiduciary or co-client exceptions to the attorney-client privilege under the facts at bar. Accordingly, we vacate the orders of the trial court and the Commonwealth Court and remand the matter to the trial court for further proceedings consistent with this opinion.

## I. Introduction

While a detailed discussion of the law is set forth *infra*, we initially provide an introduction to the basic legal concepts applicable to the subject dispute. As noted, this case involves questions of how the attorney-client privilege should apply in the context of derivative litigation. Generally, in derivative litigation, dissenting shareholders (in the case of a for-profit company) or dissenting members (in the case of a nonprofit corporation) attempt to assert claims as derivative plaintiffs on behalf of the corporation often alleging misdeeds by its current management. In such cases, both the derivative plaintiffs and current management claim to be acting in the interest of the corporation, which as an inanimate entity cannot act on its own. Taken to the extremes, courts are therefore faced with balancing the need to protect current management from baseless harassing litigation brought by disgruntled derivative plaintiffs with the need to allow derivative plaintiffs acting in good faith an opportunity to litigate legitimate derivative actions to protect the corporation from nefarious acts of current management.

In our decision in *Cuker v. Mikalauskas*, 692 A.2d 1042 (Pa. 1997), see *infra* at 29, we implemented a paradigm for addressing derivative litigation by adopting Sections 7.02-7.10 and 7.13 of the *American Law Institute, Principles of Corporate Governance: Analysis and Recommendations (1994) ("ALI Principles")*. *Cuker* clarified that derivative plaintiffs, who believe that current management are acting against the interests of the corporation, should present the corporation with a "demand" that it pursue litigation or other action for the benefit of the corporation, often against current management. In

response, the corporation, acting through its current management, may form an independent committee to investigate the claims and determine whether to pursue the action demanded. If it declines to take action and the derivative plaintiffs pursue their own derivative action in court, the corporation acting through its current management can file a motion to dismiss the case based upon the committee's determination. In such a case, a court will review the committee's determination not to pursue the derivative litigation, giving substantial deference to the committee's decision pursuant to the business judgment rule.[1]

The question presented in the case at bar concerns to what extent current management, after filing a motion to dismiss based upon the committee's recommendation, must provide derivative plaintiffs with access to materials that would otherwise not be subject to discovery pursuant to the attorney-client privilege. At base, the issue is who should be deemed to hold the attorney-client privilege for the corporation and what is the extent of the privilege, when arguably both the derivative plaintiffs and the current management claim to be acting on behalf of the corporation. Current management would argue that they hold an absolute privilege, subject only to limited disclosure as specifically required by our adoption of the *ALI Principles*, as will be discussed herein. Derivative plaintiffs would contend that the attorney-client privilege should not apply to them based upon the idea that they are bringing the claim for the

---

[1] As explained in more detail *infra*, this Court officially adopted the "business judgment rule" in *Cuker.* We explained that "the business judgment rule reflects a policy of judicial noninterference with business decisions of corporate managers, presuming that they pursue the best interests of their corporations, insulating such managers from second-guessing or liability for their business decisions in the absence of fraud or self-dealing or other misconduct or malfeasance." *Cuker*, 692 A.2d at 1046.

corporation, who is the "client," and by asserting exceptions established in our caselaw such as the fiduciary exception and/or the co-client exception.[2]

In *Cuker*, we adopted in bulk several sections of the *ALI Principles* including Section 7.13(e), which specifically addresses attorney-client privilege as it relates to a motion to dismiss derivative litigation. However, we did not discuss the provision in detail nor did we address the Comments to Section 7.13(e), which invoke the seminal decision of *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970). The court in *Garner* essentially provided a middle ground for applying the attorney-client privilege in which current management could assert the privilege against the derivative plaintiffs, but the privilege would be subject to the right of the derivative plaintiffs to show "good cause" why the privilege should not apply. The Court of Appeals then set forth a non-exclusive list of nine factors for courts to consider when determining whether the plaintiffs demonstrated good cause. The *Garner* good cause analysis has been characterized as creating a "qualitied

---

[2] Briefly, the fiduciary exception provides that the attorney-client privilege cannot be invoked by a trustee of a trust against the beneficiary of a trust where the legal advice was obtained to guide trust management, given that trustees are tasked with providing beneficiaries with information regarding the management of the trust.

Similarly, the attorney-client privilege cannot be invoked by one client against another client where the clients have been represented jointly by an attorney ("co-client" or "joint-client") or where the clients have pursued a common defense through separate counsel ("common interest"). In such cases, the clients are deemed to have waived the privilege during the period of joint representation or shared defense.

While Pennsylvania courts have applied the fiduciary and common interest exceptions, it does not appear that this Court has specifically addressed them. *See, e.g., Follansbee v. Gerlach*, 56 Pa. D. & C. 4th 483, 485 (Allegheny C.C.P. 2002); *In re Condemnation by City of Philadelphia in 16.2626 Acre Area*, 981 A.2d 391, 397 (Pa. Cmwlth. 2009). This Court has previously applied the joint-client exception. *See, e.g., Tracy v. Tracy*, 105 A.2d 122, 125 (Pa. 1954) (observing that the privilege does not apply "if the attorney represented both parties to the transaction, in which case no communications in relation to the common business are privileged in favor or against either, but only against a common adversary").

attorney-client privilege." While the *Garner* good cause analysis has been followed by the majority of courts that have considered it, it has been rejected by several courts and criticized by scholars as creating uncertainty in the application of the attorney-client privilege. We now consider its applicability under Pennsylvania law in the context of a corporation's motion to dismiss derivative litigation.[3]

## II. Factual and Procedural Background

The nonprofit corporations involved in this matter are the Pittsburgh History and Landmarks Foundation ("the Foundation") and its subsidiary, the Landmarks Financial Corporation ("the Corporation"), which manages the Foundation's endowment of approximately $100 million. The plaintiffs are five former members of the Boards of Trustees ("Boards") of the Foundation and the Corporation who allege that they were improperly and ineffectively removed from the Boards in an attempt to thwart their oversight of the Foundation's president, whom they believed was engaging in actions that were improper and not in accord with the Foundation's mission (hereinafter "Derivative

---

[3] We recognize that the General Assembly recently amended both the Business Corporation Law and the Nonprofit Corporations Law by adopting Subchapter F, entitled "Derivative Actions," within the relevant chapter addressing issues relating to "Officers, Directors and [Shareholders or Members]." 15 Pa.C.S. §§ 1781-84, 15 Pa.C.S. §§ 5781-84, respectively. These provisions generally codified, with some alterations, preexisting Pennsylvania jurisprudence, as adopted in *Cuker,* regarding derivative actions. Moreover, the amendments explicitly apply the paradigm to nonprofit corporations. *See, e.g.,* 15 Pa.C.S. § 5781 cmt. (explaining that "this subchapter generally follows the sections of the *ALI Principles* adopted in *Cuker,* while elaborating and revising certain portions of those sections of the *ALI Principles* as they apply to nonprofit corporations").

The new statutory provisions do not expressly include Section 7.13(e) of the *ALI Principles*, which addresses the attorney-client privilege in regard to motions to dismiss derivative actions. As the new enactment became effective during the appellate proceedings in this case, the parties have not presented argument regarding the applicability of the new statutes. We defer to the trial court in the first instance to determine the relevance of the new provisions on remand.

Plaintiffs").[4]   The defendants are the aforementioned long-time president of the Foundation (the "President"), the chair of the Foundation's Board of Trustees at the time the Derivative Plaintiffs were removed from the Boards, and the subsequent chair of the Foundation's Board of Trustees (hereinafter "Current Management").

The Derivative Plaintiffs' claims in the underlying derivative litigation stem from Current Management's actions in 2012-2013.  Reduced to its essence, in June 2012, the Foundation's Board created a Governance Task Force to review various practices of the Foundation.  In addition to a variety of other improvements, the Task Force recommended that both Boards be reduced substantially in number.  The Foundation Board approved this recommendation and removed all trustees then serving from both Boards; subsequently, significantly smaller boards were elected (hereinafter we will refer to the old and new boards of both entities as the "Original Board(s)" and the "Reconstituted Board(s)," respectively).[5]   As a result of these consolidations, Derivative Plaintiffs lost their seats on the Boards.

Derivative Plaintiffs view the above actions as an improper scheme by the Foundation President to avoid supervision by the Original Board members, especially in regard to investments favored by the President.  They contend that the absence of supervision could harm the Foundation and the Corporation.  Moreover, they maintain that the removal of the original trustees and reconstitution of the smaller boards with new trustees was improper under the entities' bylaws; accordingly, they refer to their removal as "purported" and contend that the Original Board remains the true board.  Conversely,

_____

[4] While we recognize that the individual plaintiffs were members of either the Foundation Board or the Corporation Board and that the distinction would matter as to the discovery attainable by each individual plaintiff, we need not distinguish between the plaintiffs for purposes of this appeal.

[5] Derivative Plaintiffs also allege that the Board did not adopt various recommendations in the Task Force's report that the President disfavored.

Current Management maintain that the process was proper and that the Reconstituted Board is the true board.

In accord with standard procedures for bringing a derivative action adopted by this Court in *Cuker*, Derivative Plaintiffs filed a written demand on the Foundation and the Corporation in October 2013 to bring an action against Current Management, which attached a draft complaint setting forth derivative claims against Current Management. As is appropriate when faced with a demand, the Reconstituted Boards of the Foundation and the Corporation met separately and agreed to form a joint Independent Investigation Committee ("Committee" or "IIC"), in November 2013, to investigate the allegations made in Derivative Plaintiffs' demand. The Committee was charged with determining whether it was in the Foundation's and the Corporation's best interest to engage in litigation against Current Management or to take other action.

After Current Management sent Derivative Plaintiffs a letter indicating that the Committee would be composed of Reconstituted Board members rather than Original Board members, Derivative Plaintiffs filed their complaint against Current Management in the trial court in December 2013 without waiting for the Committee to complete its investigation of their demand. This action was in accord with their view that the Reconstituted Board was invalid and therefore could not appoint its own members to act as an independent reviewing entity, essentially evaluating the propriety of its own existence.

Counts I and II of the complaint presented derivative claims of breach of fiduciary duty brought on behalf of the Foundation and the Corporation, respectively, asserting that Current Management's actions in removing the Original Board members were contrary to the bylaws and the interests of the Foundation and Corporation and, alternatively, that the actions were intended to solidify the President's power and silence his critics, which

was not in the interest of the Foundation and the Corporation. In Count III, Derivative Plaintiffs sought a declaratory judgment that Current Management acted improperly in removing the Original Boards. Finally, in Count IV, Derivative Plaintiffs asserted that Current Management's actions violated the Foundation's and Corporations' bylaws, resulting in a breach of their contract to comply with the bylaws. As the remedy for all counts, Derivative Plaintiffs asked for an injunction preventing the operation of the Reconstituted Boards and an order restoring the Original Boards, which would include Derivative Plaintiffs.[6]

In January 2014, Derivative Plaintiffs served on Current Management a First Set of Requests for Production. This set of requests resulted in extensive discussions between counsel in regard to the production of electronically stored information, including a searchable database to address the potentially immense production and the applicability of the attorney-client privilege to the requested production. While Current Management produced a large volume of information, the information they withheld serves as the basis for the current dispute.

While the litigation continued on Derivative Plaintiffs' claims, the Committee issued its report to the Foundation and the Corporation in August 2014 with an addendum in March 2015. The Committee concluded that reconstitution of the Boards was proper and consistent with the business judgment rule.[7] Accordingly, the Committee concluded that

---

[6] Derivative Plaintiffs also sought a declaratory judgment that the removal of the Original Board and reinstatement of the Reconstituted Board was improper as part of Count III. As Counts III and IV are not before this Court, we will not address these claims herein.

[7] In a prior motion, the parties had disputed whether the business judgment rule, as defined *supra* at 4 n.1, applied to nonprofit corporations, with Derivative Plaintiffs claiming that it did not apply. The trial court ultimately determined that the business judgment rule applied to nonprofit corporations. Derivative Plaintiffs are not seeking review of that issue in the current appeal because it is not reviewable as part of this interlocutory appeal. Pls.' Br. at 14 n.3.

it would not be in the best interest of the Foundation and the Corporation to pursue the derivative claims submitted by Derivative Plaintiffs. Current Management provided the report and addendum to Derivative Plaintiffs' counsel. In response to the Committee's report, the Boards separately voted to reject the Plaintiffs' demand.

Subsequently, in April 2015, Current Management filed a motion to dismiss Counts I and II of the Derivative Plaintiffs' derivative action. They observed that the motion to dismiss was filed in compliance with the procedure for addressing derivative claims adopted by this Court in *Cuker*. Current Management emphasized that the opinion in *Cuker* instructed trial courts to engage in limited review of board decisions to terminate derivative litigation under specified criteria relating to the independence and legitimacy of an investigating committee, *see infra* at 29. Current Management asserted that those standards had been satisfied in this case by the Committee's extensive and independent investigation and report. Therefore, they maintained that both Boards had properly exercised their business judgment in accepting the Committee's recommendation to terminate the litigation demanded by Derivative Plaintiffs. Accordingly, Current Management argued that they had satisfied the requirements of *Cuker* and that Counts I and II of Derivative Plaintiffs' litigation should be dismissed. This motion to dismiss is apparently still pending in the trial court.

While Current Management's motion to dismiss was pending in the trial court, Derivative Plaintiffs filed a motion to compel in June 2015 that is directly at issue in the current appeal. Derivative Plaintiffs sought to compel Current Management to produce the following items which Current Management had withheld claiming attorney-client privilege:

> (1) all materials involving [Foundation and Corporation attorneys] whose purported status as counsel has been used as a basis to withhold materials responsive to Derivative Plaintiffs' First Set of Requests for Production,

(2) all materials provided to or generated by the Independent Investigation Committee including but not limited [to] all legal opinions given to the IIC relating to the subject of the IIC Report, and

(3) to complete their document production responsive to Derivative Plaintiffs' First Set of Requests for Production.

Pls.' Br. in Supp. of Mot. to Compel at 4. In addition, Derivative Plaintiffs sought permission to speak with Attorney Anne Nelson, who was General Counsel to the Foundation and Corporation between 2007 and December 2012. Derivative Plaintiffs wanted to discuss with Attorney Nelson the substance of her potential testimony in the case.[8]

Derivative Plaintiffs argued that Current Management should provide them access to all the documents which Current Management provided to the Committee to develop the report, given that Current Management is relying upon the Committee's report to argue for the dismissal of Derivative Plaintiffs' claims. These documents would include those allegedly related to the dissolution and reconstitution of the Boards as well as the President's alleged attempt to suppress the Derivative Plaintiffs' criticism of his actions.[9]

Derivative Plaintiffs asserted several bases for the inapplicability of the attorney-client privilege that they continue to advance before this Court. They interpreted *ALI*

---

[8] According to Derivative Plaintiffs, Attorney Nelson provided one of the Derivative Plaintiffs with her notes while he was a trustee and she was General Counsel. Derivative Plaintiffs assert that those notes support their claims relating to the process leading to the dissolution and reconstitution of the Boards.

[9] Derivative Plaintiffs assert that they did not seek the communications with the Foundation's or Corporation's counsel relating to the current litigation other than those specifically allowed under *Cuker*'s adoption of *ALI Principles* Section 7.13, discussed *infra*. Pls.' Br. in Supp. of Mot. to Compel at 12, 17.

*Principles* Section 7.13(e),[10] as adopted in *Cuker,* to require Current Management to produce all documents given to the Committee that related to legal opinions regarding the subject matter of the Committee's report and also claimed that they could demonstrate good cause why the privilege should not apply to this derivative action. As discussed in detail *infra*, Derivative Plaintiffs additionally invoked the fiduciary and the co-client exceptions.[11]

In response to the motion to compel, Current Management framed Derivative Plaintiffs' argument as essentially claiming that the attorney-client privilege did not apply in derivative litigation. They argued that Derivative Plaintiffs failed to provide any caselaw for their broad pronouncement. Current Management instead averred that this Court already provided a framework for addressing the attorney-client privilege in derivative

---

[10] While the *ALI Principles*, including Section 7.13(e) and its Comments, are discussed in detail *infra* at 31, the subsection provides in full as follows:

> § 7.13 Judicial Procedures on Motions to Dismiss a Derivative Action Under § 7.08 or § 7.11
>
> * * * *
>
> (e) Privilege. The plaintiff's counsel should be furnished a copy of related legal opinions received by the board or committee if any opinion is tendered to the court under § 7.13(a). Subject to that requirement, communications, both oral and written, between the board or committee and its counsel with respect to the subject matter of the action do not forfeit their privileged character, and documents, memoranda, or other material qualifying as attorney's work product do not become subject to discovery, on the grounds that the action is derivative or that the privilege was waived by the production to the plaintiff or the filing with the court of a report, other written submission, or supporting documents pursuant to § 7.13.

[11] In the course of the litigation, the parties have referenced various related doctrines including the co-client, joint-client, and common interest exceptions, *see supra* at 5 n.2. We will adopt the use of the term "co-client exception" to refer to the general argument presented by Plaintiff and use the more specific terms when relevant.

litigation by adopting the *ALI Principles* in *Cuker*. In contrast to Derivative Plaintiffs' interpretation of *ALI Principles* Section 7.13(e), which would essentially require Current Management to give Derivative Plaintiffs all of the documents given to the Committee, Current Management argued that Section 7.13(e) entitled Derivative Plaintiffs only to "a copy of the [Committee] Reports (and all supporting documentation filed with the Court) and, to a more limited extent, formal legal opinions that were provided to [the Committee]." Defs.' Br. in Opp'n to Pls.' Mot. to Compel at 5. Current Management also rejected Derivative Plaintiffs' application of the fiduciary exception and the co-client exception to the derivative litigation scenario and asserted that the *Garner* good cause doctrine, *see infra* at 35, was inconsistent with Pennsylvania's attorney-client privilege.

### III. Decisions of the Trial Court and Commonwealth Court

In September 2015, the trial court granted Derivative Plaintiffs' motion to compel in substantial part by ordering Current Management to provide "all materials provided to or generated by the [Committee], including all related legal opinions and communications" and allowed Derivative Plaintiffs to "discuss with Anne Nelson the legal advice that she provided to the [Committee] and communications with the [Committee], as well as any non-privileged subjects." Tr. Ct. Order dated Sept. 18, 2015.

After Current Management appealed the order, the trial court provided an opinion in support of its decision. In short, the court adopted Derivative Plaintiffs' argument that the attorney-client privilege does not apply in derivative actions. Tr. Ct. Op. at 2-3. The court opined "that in order to determine the independence and investigative adequacy of a special litigation committee such as the IIC, Plaintiff[s'] counsel must be allowed to access documents to which the committee itself had access." *Id.* at 11. The court also favored Derivative Plaintiffs' broad interpretation of Section 7.13(e), opining that it did not

expressly recognize attorney-client protection for "documents that existed before the creation of the IIC and were not generated by counsel to the IIC," but instead only specifically exempted communications between the committee and its counsel. *Id.* at 11. Therefore, it concluded that "pre-existing documents submitted to the [Committee] must be produced once the [Committee's] report was submitted to the court." *Id.* at 12.

The trial court additionally addressed Current Management's arguments relating to the fiduciary and the common interest exceptions. The trial court summarized the fiduciary exception as providing that a trustee of a trust cannot invoke the privilege against the trust's beneficiary and instead has a duty "to furnish the beneficiaries with full and complete information regarding the trust." *Id.* at 13 (citing *Follansbee v. Gerlach*, 56 Pa. D. & C. 4th 483, 486-87 (Allegheny C.C.P. 2002)). The trial court opined that the fiduciary exception applied here "because this is a derivative action involving a trust." *Id.* at 12. The trial court then concluded that the provision applied even though the Derivative Plaintiffs were not beneficiaries of a trust because they were acting for the benefit of the Foundation and the Corporation, which held the attorney-client privilege.

The trial court also determined that the "common interest exception applies because Plaintiffs were members of [the Foundation and/or Corporation] at the time the materials in question were generated." *Id.* It viewed the exception as providing "that when parties with a common interest have counsel and later become adverse, neither party can assert the attorney-client or work product privileges as to materials during the period of common interest." *Id.* at 14.

Finally, the trial court granted Derivative Plaintiffs' request for permission to speak to Attorney Nelson, the Foundation's former General Counsel, prior to her deposition. It observed that Attorney Nelson only served as General Counsel while Derivative Plaintiffs were still members of the Boards. Therefore, under the common interest analysis set

forth above, it concluded that attorney-client privilege did not apply to preclude Derivative Plaintiffs access during the relevant time period because "[Attorney] Nelson and Plaintiffs had a common interest at the time she represented" the Foundation. *Id.* at 16.

In April 2017, a unanimous, *en banc* panel of the Commonwealth Court vacated the trial court's order and remanded the matter for further proceedings.[12] *In re: Pittsburgh History and Landmarks Foundation*, 161 A.3d 394 (Pa. Cmwlth. 2017). As explained below, the court concluded that the trial court erred in ordering Defendants to produce to Plaintiffs all the documents that had been provided to the Committee based upon the trial court's erroneous conclusion that the fiduciary and common interest exceptions applied and instead remanded for consideration of whether more limited discovery would be justified under the *Garner* good cause analysis.

To analyze the question, the Commonwealth Court turned to the *ALI Principles* adopted in *Cuker*, recognizing that they provide a paradigm for derivative litigation. It explained that Section 7.13(e) specifically addressed the attorney-client privilege. The Commonwealth Court observed that the Comment to Section 7.13(e), as well as the Reporter's Note, referenced the nine-factor *Garner* "good cause" analysis as an "accepted doctrine" applicable to attorney-client privilege in derivative litigation. *Id. at*

---

[12] The Current Management originally filed the appeal in the Superior Court which transferred the case to the Commonwealth Court in December 2015, because the Commonwealth Court has appellate jurisdiction over "[a]ll actions or proceedings relating to corporations not-for-profit arising under Title 15 (relating to corporations and unincorporated associations)" and actions involving the corporate affairs of not-for-profit corporations. 42 Pa.C.S. § 762(5). The Commonwealth Court ordered the parties to brief the basis for an appeal of the order given that the order appealed was not final. Cmwlth. Ct. Order of Feb. 22, 2016.

In its subsequent opinion, the Commonwealth Court concluded that the case presented an appealable collateral order involving the discovery of materials that were potentially subject to the attorney-client privilege and work product doctrine. *In re: Pittsburgh History and Landmarks Foundation*, 161 A.3d 394, 397 (Pa. Cmwlth. 2017) (citing *Commonwealth v. Blystone*, 119 A.3d 306 (Pa. 2015)).

*407.* The court quoted the Fifth Circuit Court of Appeals in *Garner* as opining that, in derivative actions by stockholders, the protections of the stockholders' interests "as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance." *Id.* at 406 (quoting *Garner*, 430 F.2d at 1103 - 04).

The Commonwealth Court additionally considered the applicability of Section 85 of the *Restatement (Third) of the Law Governing Lawyers*, entitled "Communications Involving a Fiduciary Within an Organization."[13] The court recognized that this Court has often relied upon the *Restatement (Third) of the Law Governing Lawyers* when addressing the parameters of the attorney-client privilege. *Id.* at 407 (citing *Gillard v. AIG Ins. Co.*, 15 A.3d 44 (Pa. 2011)). It opined that, like the *ALI Principles*, Section 85

---

[13] In full, Section 85, entitled "Communications Involving a Fiduciary Within an Organization," provides:

> In a proceeding involving a dispute between an organizational client and shareholders, members, or other constituents of the organization toward whom the directors, officers, or similar persons managing the organization bear fiduciary responsibilities, the attorney-client privilege of the organization may be withheld from a communication otherwise within § 68 if the tribunal finds that:
>
> (a) those managing the organization are charged with breach of their obligations toward the shareholders, members, or other constituents or toward the organization itself;
>
> (b) the communication occurred prior to the assertion of the charges and relates directly to those charges; and
>
> (c) the need of the requesting party to discover or introduce the communication is sufficiently compelling and the threat to confidentiality sufficiently confined to justify setting the privilege aside.

*Restatement (Third) of the Law Governing Lawyers* § 85 (2000).

"essentially adopts the *Garner* potential exception to the attorney-client privilege in suits where there is a fiduciary relationship." *Id.*

The Commonwealth Court then interpreted Section 7.13 of the *ALI Principles* and Section 85 of the *Restatement (Third) of the Law Governing Lawyers* as allowing courts to withhold the "the attorney-client privilege for a communication that occurred prior to the assertion of charges [by derivative plaintiffs] and relating directly to those charges" and, importantly, viewed it to be "in addition to the limited waiver of the attorney-client privilege to legal opinions based on the submission to the trial court of an investigating committee's report in support of a motion to dismiss." *Id.* at 408 (emphasis removed).

Accordingly, the Commonwealth Court vacated the trial court's order and remanded for that court to engage in a *Garner* good cause analysis to determine whether the attorney-client privilege should be withheld in this case. The court seemed to contemplate that discovery could be allowed regarding several categories of information sought by the Derivative Plaintiffs.[14] The court opined, however, that the discovery allowed under the *Garner* good cause analysis would be more limited than the discovery previously ordered by the trial court, specifically emphasizing that it would not provide for discovery related to counsels' advice regarding the pending litigation. *Id.* at 410.

The court also interpreted a key phrase of Section 7.13(e), which provides for discovery of "related legal opinions," as only requiring the current management in derivative litigation to produce to derivative plaintiffs' formal legal opinions given to the Independent Committee "'pertaining to the same general subject matter' as the [Independent Committee's] counsel's formal opinion." *Id.* at 411 (quoting *ALI Principles*

---

[14] Specifically, the Commonwealth Court opined that the trial court could order discovery related to legal advice about "efforts to pack the nonprofit corporation boards," about specified investments of the board, and "about whether a Board could vote out all existing Trustees and elect successors based on a state statute, where a Board by-law only provided for termination of directors for cause," if the advice was "rendered at about the time of those alleged events and before the current suit was pending." *Id.* at 410.

§ 7.13(e) cmt. e). The court recognized that this terminology related to the process contemplated by other provisions of Section 7.13 under which management submits to the court, in support of its motion to dismiss, a formal legal opinion that the committee has relied upon to conclude that the derivative litigation is not in the best interests of the corporation. The Commonwealth Court recognized that Section 7.13(e)'s requirement that current management provide derivative plaintiffs with "related legal opinions" was "intended to discourage opinion shopping" whereby current management would only disclose to the trial court and the derivative plaintiffs those legal opinions that supported dismissal of the derivative action. The Commonwealth Court presumed that Current Management had to produce legal opinions that pertain to "whether continuing the current litigation is in the best interest of the nonprofit corporations." *Id.* The court, however, warned that it did not provide for the general disclosure of "any legal opinion from any time," which had been provided to the Committee. *Id.*

The Commonwealth Court next addressed the question of whether Derivative Plaintiffs should be permitted to talk with Attorney Nelson, the former General Counsel. The court remanded the issue to the trial court to apply the *Garner* good cause analysis to determine whether to withhold the attorney-client privilege but also cautioned that, even if the trial court deemed it permissible, any discussion with Attorney Nelson should be limited to "communications that were roughly contemporaneous with the events giving rise to the litigation," which would relate to the time period she served as General Counsel between 2009-2012. *Id.*

The Commonwealth Court also briefly addressed the Derivative Plaintiffs' assertion of the fiduciary exception to the attorney-client privilege. The court faulted the trial court for failing to recognize that the fiduciary exception as expressed in Section 84 of the *Restatement (Third) of the Law Governing Lawyers* requires the existence of a

trust. Instead, it agreed with the court in *Garner*, which used the fiduciary exception as a "starting point," but "struggled . . . to characterize corporate management's duties as being co-extensive with those of a common law trustee." *Id.* at 412 (quoting *Garner*, 430 F.2d at 1101 - 02).

Finally, the Commonwealth Court considered Derivative Plaintiffs' assertion of the co-client exception to the attorney-client privilege. The court opined that the Plaintiffs' claim was based upon an exception provided in Section 75 of the *Restatement (Third) of the Law Governing Lawyers*, addressing the situation where clients are "jointly represented by the same lawyer in a matter." *Id.* at 412 (quoting *Restatement (Third) of the Law Governing Lawyers* § 75 (2000)). The Commonwealth Court summarized this section as providing "that the privilege cannot be raised by one co-client against another in subsequent adverse proceedings between them." Id. at 413 (citing *In re Teleglobe Communications Corp.*, 493 F.3d 345 (3d Cir. 2007)).

The Commonwealth Court concluded that the application of the co-client exception was problematic in the case at bar. Based upon the pleadings in the current case, the Commonwealth Court opined that any co-client relationship between Derivative Plaintiffs and Current Management, as jointly represented by Attorney Nelson, likely dissolved sometime between 2009 and 2012, when the interests of the parties diverged such that there was no "common" interest. Observing that all parties agreed that the Foundation was the true client of Attorney Nelson, the court further noted that precedent addressing legal representation of corporations recognized that "corporations must act through persons" and that "control of the privilege passes with control of the corporation." *Id.* (citing *In re Teleglobe Communications Corp.*, 493 F.3d at 362).

As applied to this case, the court concluded that, because Current Management had control of the Foundation and the Corporation, they also held the privilege for the

entities. The court, therefore, rejected application of the co-client exception to the current litigation and remanded the case to the trial court to engage in a *Garner* analysis to determine if Derivative Plaintiffs demonstrated good cause why the attorney-client privilege should not prevent their discovery of the requested documents.

## IV. Parties' Arguments

The parties filed cross-petitions for allowance of appeal raising four issues, which this Court granted. Current Management challenged the Commonwealth Court's adoption of the "good cause" analysis as set forth in *Garner* and Section 85 of the Restatement.[15] Derivative Plaintiffs cross-appealed challenging the Commonwealth Court's refusal to apply the fiduciary exception and the co-client exception as basis for deeming the attorney-client privilege inapplicable to the documents they seek.[16]

---

[15] Current Management raised the following Issues:

> a. Whether, in the context of derivative litigation, the Commonwealth of Pennsylvania will adopt the qualified attorney-client privilege, the scope of which is subjectively determined, as articulated in the often criticized decision of *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), *cert. denied*, 401 U.S. 974 (1971), and as articulated in the *Restatement (Third) of the Law Governing Lawyers*, § 85, where the ambiguous and uncertain scope of such a privilege is inconsistent with Pennsylvania Supreme Court precedent and in conflict with the Pennsylvania statute codifying the attorney-client privilege.

> b. Whether, even if this Court adopts *Garner*'s qualified attorney-client privilege as the law of Pennsylvania, such a privilege is applicable to derivative litigation that arises out of disputes between former Board members and current Board members with no corresponding fiduciary relationship.

[16] Derivative Plaintiffs asserted the following issues:

> a. Whether the fiduciary duty exception to the attorney-client privilege is applicable to discovery sought by either the derivative not-for-profit corporate Plaintiff or the purportedly

## A. Current Management's Appeal - Applicability of Good Cause Analysis

Current Management assert that the good cause analysis as described in *Garner* and Section 85 of the Restatement is contrary to the Pennsylvania statute codifying the attorney-client privilege, 42 Pa.C.S § 5928,[17] and the caselaw interpreting it. They view the statutory privilege as unequivocally instructing that "counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same." Defs.' Br. at 22 (quoting 42 Pa.C.S. § 5928).

Current Management maintain that the *Garner* good cause analysis is fundamentally different from any exceptions to the attorney-client privilege that have been countenanced under Pennsylvania jurisprudence. With other exceptions, Current

removed Trustees of the not-for-profit corporation who are bringing the derivative action, when the corporation received and/or paid for the advice in question which was given regarding and at the time of events occurring while the individual Derivative Plaintiffs were unquestionably Trustees.

b. Whether the common interest or co-client exception to the attorney-client privilege is applicable to discovery sought by either the derivative not-for-profit corporate Plaintiff or the purportedly improperly removed Trustees of the not-for-profit corporation who are bringing the derivative action, when the corporation received and/or paid for the advice in question, which was given regarding and at the time of events occurring while the individual Derivative Plaintiffs were unquestionably Trustees.

[17] Section § 5928, entitled "Confidential communications to attorney," provides in full,

In a civil matter[,] counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client.

42 Pa.C.S. § 5928.

Management observe that there is certainty as to whether the privilege applies based on the subject matter at the time of the communication. For example, the fiduciary exception applies only if a fiduciary relationship of a trust exists. Moreover, Current Management emphasize that if the privilege applies, then it applies absolutely. In contrast, Current Management argue that the good cause analysis is not an exception but rather a different type of attorney-client privilege, which they view as a "qualified privilege." They contend that the *Garner* good cause analysis involves "a purely subjective analysis, subjecting both counsel and the client to uncertain outcomes of the analysis." Defs.' Br. at 31, *see also id.* at 29-30 (reviewing scholarly and judicial criticism of the good cause analysis). According to Current Management, the inconsistency engendered would erode the ability of clients and counsel to communicate freely about issues relating to the corporation.

For similar reasons, Current Management argue for the rejection of Section 85 of the *Restatement (Third) of the Law Governing Lawyers*. They view Section 85 as providing even less predictability than the *Garner* good cause analysis because, rather than utilizing *Garner*'s nine factors, the Restatement provides for a court to consider whether the "need of the requesting party . . . is sufficiently compelling and the threat to confidentiality sufficiently confined to justify setting the privilege aside." Defs.' Br. at 33 *(quoting Restatement (Third) of the Law Governing Lawyers* § 85), Defs.' Second Br. at 27.

Current Management next explain that the adoption of Section 7.13 of the *ALI Principles* by this Court in *Cuker* does not equate to an adoption of the *Garner* good cause analysis. Instead, they contend that the adoption of Section 7.13 can and should be interpreted to conform to Pennsylvania's attorney-client privilege law. They highlight, as did the Commonwealth Court, that Section 7.13(e) provides for the limited production of "related legal opinions" to derivative plaintiffs if the corporation's current management

submits a legal opinion to the court in support of its motion to dismiss the derivative litigation. Current Management emphasize that the phrase "related legal opinions" does not require the production of all legal opinions received by the corporation, including those sought by the Plaintiffs that preexisted the formation of the committee investigating the derivative action. They maintain that this limited production is logical because the *ALI Principles* come into play only in the context of a defendant's motion to dismiss a derivative action based upon the recommendation of the independent committee. Additionally, Current Management emphasize that a court's review of the board's or committee's determination to terminate the derivative litigation involves not the merits of the decision but only whether "the board's or committee's determinations fail to satisfy the requirements of the business judgment rule." Defs.' Second Br. at 31-32 (quoting *ALI Principles* § 7.10). Accordingly, they aver that any production of privileged documents that preexisted the formation of the Committee should be considered under standard attorney-client privilege rather than under Section 7.13(e)'s provision for the production of "related legal opinions."

In contrast, Derivative Plaintiffs urge this Court to follow the lead of our sister courts that have adopted the *Garner* good cause analysis. They propose that the *Garner* good cause analysis provides "a mechanism to handle attorney-client privilege and work product within the unique realm of shareholder derivative litigation involving fiduciary aspects." Pls.' Br. at 20. To refute Current Management's reliance on Pennsylvania's statutory attorney-client privilege, they emphasize that other states have incorporated the *Garner* good faith analysis despite having a similar statutory privilege, including Delaware in *Wal-Mart Stores, Inc. v. Indiana Electrical Workers Pension Trust Fund IBEW*, 95 A.3d 1264 (Del. 2014).

Derivative Plaintiffs maintain that the Commonwealth Court correctly concluded that Section 7.13 and its Comments incorporated the *Garner* good cause analysis. Derivative Plaintiffs reject Current Management's assertion that this Court in *Cuker* adopted Section 7.13 only to the extent it is consistent with preexisting Pennsylvania's attorney-client privilege law. In contrast, Derivative Plaintiffs argue that our holding in *Cuker* does not suggest a piecemeal adoption of Section 7.13, but rather adopts it in full. Pls.' Br. at 25.

Derivative Plaintiffs reject Current Management's complaint that the *Garner* good cause analysis would create uncertainty and inconsistency in application. They assert that the detailed nine-factor good cause analysis in *Garner* provides the necessary guidance and observe that the test has been adopted and applied by a number of jurisdictions. *Id.* at 32 (compiling cases adopting *Garner).*

Derivative Plaintiffs argue that application of the *Garner* good cause analysis is appropriate in the current case where both Derivative Plaintiffs and Current Management were fiduciaries of the Foundation and the Corporation at the time of the relevant communications between counsel and the Foundation and Corporation. Derivative Plaintiffs assert that they are exercising their fiduciary duties in bringing the derivative action for the benefit of the Foundation and the Corporation, which are identified in the caption as both plaintiffs and defendants.

Derivative Plaintiffs additionally support the adoption of the *Garner* good cause analysis by reference to Section 85 of Restatement (Third) of Law Governing Lawyers, which, in their view, incorporates a test similar to the *Garner* good cause analysis, *see supra* at 16 n.13. They highlight that this Court has relied upon this Restatement, generally, in the past in regard to other questions related to the attorney-client privilege. *Id.* at 36 (citing *Gillard*, 15 A.3d at 52). Derivative Plaintiffs contend that this Court in

*Gillard* refused a strict construction of the statutory attorney-client privilege and instead extended the privilege to include communications from attorneys to clients as well as from clients to attorneys, as encompassed in Section 69 of the Restatement. They thus urge this Court to look to Section 85 of the Restatement.

## B. Derivative Plaintiffs Cross-Appeal

In the event that the Court declines to adopt the *Garner* good cause analysis, Derivative Plaintiffs argue in the alternative for the application of the fiduciary exception and the co-client exception. In response, Current Management seek to refute the underlying premise of both of Derivative Plaintiffs' asserted exceptions, which they view as based upon Derivative Plaintiffs' attempts to align themselves with the Foundation and Corporation as the clients holding the attorney-client privilege, when Current Management argue that Derivative Plaintiffs are merely former board members.

## 1. Fiduciary Exception

Derivative Plaintiffs explain that under the fiduciary exception, the attorney-client privilege cannot be asserted by a trustee against a trust's beneficiaries where the attorney provided advice regarding the management of the trust in which the beneficiaries hold an interest. Pls.' Br. at 49-50 (relying upon *Follansbee*, 56 Pa. D. & C. 4th 483). Likewise, Derivative Plaintiffs argue that Current Management, as trustees owing a fiduciary duty to the Foundation and the Corporation, cannot assert the attorney-client privilege against the Foundation and the Corporation. They claim that the legal advice sought in this case was provided to the Foundation and the Corporation, and those entities hold the privilege through all the trustees, including Derivative Plaintiffs. Derivative Plaintiffs assert that they are bringing the claims for the privilege-holding Foundation and Corporation, and therefore, the privilege cannot be asserted by Current Management against them.

Derivative Plaintiffs seek the reversal of the Commonwealth Court's conclusion that the fiduciary duty exception is inapplicable absent a trust. Derivative Plaintiffs claim that the trustees of a nonprofit corporation serve functions similar to trustees for a trust. They observe that nonprofit corporations are granted tax-exempt status because they are organized to benefit the public, as a trust is organized for the benefit of the beneficiaries. Similar to trustees of a trust, the trustees on the Foundation's and Corporation's Boards are required by the bylaws to "administer, manage, preserve and protect the property" of the nonprofit corporations. *Id.* at 47. Derivative Plaintiffs also cite a federal decision recognizing that the fiduciary exception has been applied outside of the trust context to relationships between "unions and members, lawyers and other lawyers, banks and clients, and general partners in both general and limited partnerships." Pls.' Reply Br. at 12-13 (quoting *Lugosch v. Congel*, 219 F.R.D. 220, 243 (N.D.N.Y. 2003)).

In contrast, Current Management maintain that the fiduciary doctrine can be invoked only by one who could be considered a beneficiary of a trust and owed a fiduciary duty by the trustee. Explaining the underlying logic of the fiduciary exception, Current Management contend that trustees of a trust "are functioning as proxies for the beneficiary, and in accordance with the terms of the trust instrument. By definition, communications between a trustee and trust counsel are legally equivalent to communications with the beneficiaries." Defs.' Second Br. at 44. Current Management assert that the trust paradigm does not apply to Derivative Plaintiffs who are not the beneficiaries of a trust. For the fiduciary exception to be relevant, Current Management contend that Derivative Plaintiffs would have to show that Current Management or the Foundation/Corporation owed Derivative Plaintiffs a fiduciary duty. They assert that this case "involves the reverse scenario" where Derivative Plaintiffs, as former members of

the Board of Trustees, owed fiduciary duties to the Foundation or the Corporation. *Id.* at 3.

### 2. Co-Client/ Exception

Additionally, Derivative Plaintiffs continue to assert the applicability of the co-client or common interest exception. They summarize these similar doctrines as providing that "[w]hen parties with a common interest have counsel and later become adverse, neither party can assert the attorney-client privilege or attorney work product privileges as to materials generated during the period of common interest." Pls.' Br. at 53. They additionally assert that our sister courts have applied the common interest and the co-client doctrine "to require a corporation to produce otherwise attorney-client privileged materials in suits involving directors of the corporation." *Id.* at 54-55 (collecting cases).

Derivative Plaintiffs assert that they share a common interest with the Foundation and the Corporation because their "interests never diverged since the [Derivative Plaintiffs] are discharging the duty placed upon them by the Bylaws to 'administer, manage, preserve and protect the property' of the corporation." *Id.* at 52. They emphasize that they have not sought any recovery for themselves as individuals.

Derivative Plaintiffs further contest the Commonwealth Court's utilization of the presumption that only the current management of a corporation should be deemed to hold the privilege for the corporation. Instead, they argue that the presumption should not apply when plaintiffs are alleging that the current management obtained control improperly.

Current Management respond by arguing that Derivative Plaintiffs have conflated two doctrines, which they contend are distinct in that "[t]he common interest doctrine applies when multiple clients are represented by separate counsel, and the [co-client] privilege applies when a single lawyer represents multiple clients." Defs.' Second Br. at

48. First, addressing the common interest doctrine, Current Management explain that the doctrine is "an extension of the attorney-client privilege" in which clients represented by separate attorneys waive their privilege in regard to each other to allow counsel to coordinate their defense, but do not waive the privilege as to third parties. *Id.* Current Management assert that the parties in this case did not utilize separate counsel to coordinate a defense against a common adversary. They assert that the doctrine simply does not apply to the facts.

Turning to the co-client doctrine, Current Management recognize that it applies where a single attorney represents multiple clients. For the doctrine to apply, Current Management claim that the clients have to share "an identical or nearly identical legal interest, so that their shared attorney can represent them with the candor and loyalty required by the ethical rules." *Id.* at 51. Current Management assert that no Pennsylvania court has ever applied this concept "to eliminate the distinction between a corporation's officers and directors and the corporation itself," *id.,* in contrast to other states which employ a "collective corporate client" approach in which directors are treated as co-clients of the corporate counsel. *Id.* at 52-53. They argue that this approach is antithetical to Pennsylvania, which instead employs the "entity is the client" approach. *Id.* at 54. Current Management explain that the "entity is the client" approach recognizes that the entity acts through its current management, and not through former directors, such as Derivative Plaintiffs. *Id.* at 55.

Moreover, Current Management express concern with a rule that would essentially waive the privilege anytime a person in management leaves their position: "To rule otherwise would defeat the expectation of confidentiality, and would chill the willingness of corporate management to speak candidly about privileged matters, knowing that

someday one of their number may leave and become adverse to the corporation." *Id.* at 59.

## V. Analysis

### A. *Cuker* and the *ALI Principles*

Prior to addressing the questions in this case, we first review our decision in *Cuker* and the *ALI Principles* adopted therein addressing derivative litigation. In *Cuker*, a group of shareholders made a demand on the company to pursue litigation against some of the company's directors and officers, claiming mismanagement. As in the case at bar, the company created a special litigation committee to consider the demand. While the committee was investigating, a second group of shareholders filed suit against the company's officers and directors raising similar issues to those of the original shareholders' demand. Subsequently, the special litigation committee concluded that pursuing the derivative litigation was not in the corporation's best interest, a decision later adopted by the board. The board's denial precipitated a second action filed by the first group of shareholders. Both groups of shareholders litigated the claims on separate tracks resulting in inconsistent verdicts, which this Court addressed under our King's Bench powers.

First, the Court in *Cuker* clarified that, while no Pennsylvania court had overtly adopted the business judgment rule, it had been applied by our courts for over a century. The Court summarized the doctrine: "[T]he business judgment rule reflects a policy of judicial noninterference with business decisions of corporate managers, presuming that they pursue the best interests of their corporations, insulating such managers from second-guessing or liability for their business decisions in the absence of fraud or self-dealing or other misconduct or malfeasance." *Id.* at 1046. Next, the Court held that the business judgment rule applied to management decisions related to derivative litigation,

concluding that such decisions are "business decisions as much as any other financial decisions." *Id.* at 1048.

The Court acknowledged confusion in Pennsylvania law caused by the absence of a "procedural mechanism for implementation and judicial review of the board's decision" to terminate the derivative litigation. *Id.* Accordingly, the Court provided the following structure: "Without considering the merits of the action, a court should determine the validity of the board's decision to terminate the litigation; if that decision was made in accordance with the appropriate standards, then the court should dismiss the derivative action prior to litigation on the merits." *Id.* The Court noted that the judicial intervention should be minimized and instructed that only limited discovery should be permitted in such cases. It provided six factors for trial courts to consider in evaluating a board's decision to terminate derivative litigation.[18] If the factors are met, then "the business judgment rule applies and the court should dismiss the action." *Id.*

---

[18] The Court set forth the following six considerations:

> [1] whether the board or its special litigation committee was disinterested,
>
> [2] whether it was assisted by counsel,
>
> [3] whether it prepared a written report,
>
> [4] whether it was independent,
>
> [5] whether it conducted an adequate investigation, and
>
> [6] whether it rationally believed its decision was in the best interests of the corporation (i.e., acted in good faith).

*Id.* at 1048.

To implement this broad framework, the Court specifically adopted *ALI Principles* Sections 7.02-7.10 and 7.13,[19] which it found relevant to the case before it, concluding that those "sections set forth guidance which is consistent with Pennsylvania law and precedent, which furthers the policies inherent in the business judgment rule, and which provides an appropriate degree of specificity to guide the trial court in controlling the proceedings." *Id.* at 1049. In so doing, the Court noted that it had previously relied upon the scholarship of the ALI and that the *ALI Principles* are "generally consistent with Pennsylvania precedent." *Id.*

While *Cuker* addressed the general process of derivative litigation in Pennsylvania through the application of the business judgment rule and the adoption of the relevant *ALI Principles*, we now consider in detail one of the adopted sections, specifically Section 7.13, as we grapple with the role of attorney-client privilege in derivative litigation. We recognize the conceptual difficulties of the attorney-client privilege in derivative litigation where both sides profess to represent the corporation, which is the true client and holder of the privilege but which cannot act on its own. Nevertheless, we also observe that Pennsylvania courts have utilized the presumption set forth in *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 348-49 (1985), that current management of a solvent corporation has the authority to act on behalf of the corporation, including in regard to the attorney-client privilege. *See Maleski by Chronister v. Corporate Life Ins. Co.*, 641 A.2d 1, 3 (Pa. Cmwlth. 1994) (citing 15 Pa.C.S. § 1721 (providing that all powers . . . vested by law in a business corporation shall be exercised by or under the authority of . . . a board of directors"); *see also Red Vision Systems, Inc. v. National Real*

---

[19] The Court summarized the relevant provisions: "Sections 7.02 (standing), 7.03 (the demand rule), 7.04 (procedure in derivative action), 7.05 (board authority in derivative action), 7.06 (judicial stay of derivative action), 7.07, 7.08, and 7.09 (dismissal of derivative action), 7.10 (standard of judicial review), and 7.13 (judicial procedures)." *Id.* at 1049.

*Estate Information Services, L.P.,* 108 A.3d 54, 60-61 (Pa. Super. 2015) (discussing *Weintraub*, 471 U.S. 343).

Section 7.13, which has been adopted in Pennsylvania, broadly addresses judicial procedures for adjudicating motions to dismiss the derivative litigation following management's decision to adopt an independent committee's recommendation to decline to pursue the derivative claims demanded by plaintiffs. Subsection 7.13(a) mandates that the corporation "file with the court a report or other written submission setting forth the procedures and determinations of the board or committee" in support of the motion to dismiss. *ALI Principles* § 7.13(a). It further requires that "[a] copy of the report or other written submission, including any supporting documentation filed by the corporation, shall be given to the plaintiff's counsel." *Id.*

Under subsection (c), discovery is permissible only "if the plaintiff has demonstrated that a substantial issue exists whether the applicable standards of § 7.08, § 7.09, § 7.10, § 7.11, or § 7.12 have been satisfied and if the plaintiff is unable without undue hardship to obtain the information by other means."[20] *Id.* at § 7.13(c). The subsection also cautions trial courts to grant only limited discovery "in the absence of special circumstances" and to allow it only in regard to what the court views as relevant to the applicable standards of the listed sections and "consistent with an expedited resolution of the motion" to dismiss the derivative litigation. *Id.*

As noted, Section 7.13 addresses the attorney-client privilege in subsection (e) in regard to motions to dismiss derivative litigation based upon the recommendation of the independent committee, providing in full as follows:

> § 7.13 Judicial Procedures on Motions to Dismiss a Derivative
> Action Under § 7.08 or § 7.11
>
> * * * *

---

[20] The listed sections generally address standards for dismissing litigation.

(e) Privilege. The plaintiff's counsel should be furnished a copy of related legal opinions received by the board or committee if any opinion is tendered to the court under § 7.13(a). Subject to that requirement, communications, both oral and written, between the board or committee and its counsel with respect to the subject matter of the action do not forfeit their privileged character, and documents, memoranda, or other material qualifying as attorney's work product do not become subject to discovery, on the grounds that the action is derivative or that the privilege was waived by the production to the plaintiff or the filing with the court of a report, other written submission, or supporting documents pursuant to § 7.13.

Relevantly, the first sentence of subsection (e) requires the corporation to provide plaintiff's counsel not only with the committee's report which was submitted to the court in support of dismissing the derivative litigation under subsection (a), but also a "copy of related legal opinions" reviewed by the board or committee, even if not relied upon in the dismissal recommendation.[21] The Comment to subsection (e) explains that the written submission of the committee's report in favor of dismissing the derivative litigation "waives the privilege as to such documents and, to a more limited extent, as to the process of their preparation."[22] *Id.* at cmt. e.

As Current Management in the case at bar accept, the Comment explains that the disclosure to derivative plaintiffs of the other "related legal opinions" is consistent with long-standing attorney-client jurisprudence involving a party's utilization of the "reliance on counsel defense." Courts have recognized that a party cannot defend an action by claiming reliance upon an attorney's advice and then refuse to provide the opposing side

---

[21] The remaining portions of subsection (e) address communications between the board or the committee and its counsel and that counsel's work product in regard to the derivative litigation. Derivative Plaintiffs assert that they are not seeking this category of documents. Accordingly, we will not discuss those provisions.

[22] Given the length of Comment (e), we will summarize the relevant portions rather than reproducing it in full.

with that advice. Likewise, the Comment reasons that "it would be unfair if the board or committee could rely on legal advice from its counsel that the action was not meritorious as a ground for dismissing the action and then deny plaintiff access to the substance of that advice." *Id.* According to the Comment, this process protects against "opinion shopping without chilling the board's or committee's access to confidential legal advice." *Id.* Nevertheless, as indicated in the Reporter's Note, "additional discovery of the board's or committee's counsel is not intended by § 7.13(e), even though the tender of the opinion to the court might be deemed a waiver of the privilege under traditional formulations of the privilege." *Id.* at Reporter's Note 4.

Comment (e) additionally discusses the nine-factor *Garner* good cause analysis.[23] Notably, Comment (e) acknowledges that the *Garner* good cause analysis has been widely adopted by courts confronted with the scenario where a derivative plaintiff is attempting to represent the corporation that is the "client" in the attorney-client relationship. It explains that the good cause analysis does not deem the privilege to be wholly unavailable. Instead, it merely allows plaintiffs to demonstrate "'good cause' why the privilege should not be applied against" them and provides courts with criteria to determine whether plaintiffs have demonstrated the necessary good cause. *Id.* at cmt. e.

Comment (e) to Section 7.13, however, does not necessarily adopt the *Garner* good cause analysis. Instead, the Comment focuses on only two of the nine *Garner* factors, specifically "whether the communication is of advice concerning the litigation itself and whether the communication related to past or prospective actions." *Id.* (quoting *Garner*, 430 F.2d at 1104) (internal quotation marks removed). The Comment emphasizes that the cases applying *Garner* in regard to these two factors have withheld the privilege in relation to materials that were "roughly contemporaneous with the events

---

[23] The *Garner* factors are set forth in full *infra* at 36 n.25.

giving rise to the litigation" but refused to allow plaintiffs access to communications related to the pending derivative litigation. *Id.*

The Comment highlights that the *Garner* line of cases, therefore, does not conflict with Section 7.13(e) which provides similar protections for communications between committee and its counsel concerning the pending litigation and "only requires disclosure to the plaintiff of the report or other written submission to the court and any supporting documentation," under subsection 7.13(a) for purposes of adjudicating a motion to dismiss derivative litigation. *Id.* Notably, the Comment does not speak to the other seven factors, nor does it expressly adopt the test in full.[24] Accordingly, we conclude that this Court's adoption in *Cuker* of Section 7.13 does not equate to an adoption of the *Garner* test, which we consider and ultimately reject in the next sections of this opinion.

### B. The Garner Good Cause Analysis

As noted, Derivative Plaintiffs urge the Court to adopt the *Garner* good cause analysis. In *Garner*, the United States Court of Appeals for the Fifth Circuit considered the assertion of the attorney-client privilege by a corporation's current management against derivative shareholders, who brought claims on behalf of the corporation alleging that the current management engaged in, *inter alia*, securities violations and fraud to the detriment of the corporation as well as the shareholders.

The *Garner* court recognized the tension inherent in the attorney-client privilege in derivative litigation. It acknowledged that the privilege encourages current management

---

[24] The remaining paragraphs of Comment (e) address issues relating to whether the filing or production of documents under Section 7.13(e) results in the waiver of the privilege in regard to third parties, including the press. As this issue is not before this Court, we will not address it.

Comment (f), which addresses the work product doctrine, explains that "counsel's notes, internal drafts, correspondence with witnesses, and similar materials should normally be protected from disclosure under the work product doctrine, regardless of the availability of the attorney-client privilege." *ALI Principles* § 7.13 cmt f.

to seek the guidance of counsel without the fear that the content of the discussions will later be divulged to disgruntled shareholders. Nevertheless, it also observed that management acts not for its own benefit but for the shareholders' benefit, such that the shareholders are arguably the clients for purposes of the privilege. *Garner*, 430 F.3d at 1101.

In weighing the equities, the *Garner* court ultimately rejected a view of the attorney-client privilege as absolute in derivative litigation and instead reasoned as follows:

> The attorney-client privilege still has viability for the corporate client. The corporation is not barred from asserting it merely because those demanding information enjoy the status of stockholders. But where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance.

*Id. at* 1103 - 04. The court then provided nine factors to consider in determining whether derivative plaintiffs have demonstrated good cause for piercing the attorney-client privilege.[25]

---

[25] The nine factors are as follows:

> [1.] the number of shareholders and the percentage of stock they represent; [2.] the bona fides of the shareholders; [3.] the nature of the shareholders' claim and whether it is obviously colorable; [4.] the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; [5.] whether, if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; [6.] whether the communication related to past or to prospective actions; [7.] whether the communication is of advice concerning the litigation itself; [8.] the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; [and] [9.] the risk of revelation of trade secrets

As noted, a number of courts that have considered the issue have adopted this framework for attorney-client privilege in derivative litigation. *See, e.g., Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Trust Fund IBEW*, 95 A.3d 1264 (Del. 2014); *see also* John W. Gergacz, *Attorney-Corporate Client Privilege* § 6:2 n.2 (3d, 2018-2 ed.). Other courts, however, have rejected the analysis as inconsistent with their precedent relating to the attorney-client privilege. *See, e.g., Shirvani v. Capital Investing Corp. Inc.*, 112 F.R.D. 389 (D. Conn. 1986); *see also Gergacz*, *§6.2 n.1*. Of particular note, Judge Wettick of the Allegheny County Court of Common Pleas considered the application of the *Garner* good case analysis in *Agster v. Barmada*, 43 Pa. D. & C. 4th 353 (Allegheny C.C.P. 1999). He rejected the analysis on the basis that "Pennsylvania has a stronger attorney-client privilege than the privilege recognized in those jurisdictions that use a balancing approach." *Id.* at 370. He held that "[a] qualified attorney-client privilege is inconsistent with the rulings of the Pennsylvania Supreme Court that the purpose of the privilege is to guarantee the confidentiality of an attorney-client communication." *Id.* at 371.

## C. *Garner* and the Attorney-Client Privilege in Pennsylvania

We now consider whether to affirm the Commonwealth Court's adoption of the *Garner* good cause analysis in light of Pennsylvania's attorney-client privilege jurisprudence.[26] We have often recognized the conflict inherent in the attorney-client privilege. On the one hand, our precedent disfavors evidentiary privileges which are "in

---

or other information in whose confidentiality the corporation
has an interest for independent reasons.

*Id.* at 1104

[26] As we have previously observed, questions involving application of the attorney-client privilege are questions of law. Accordingly, our standard of review is *de novo* and our scope of review is plenary. *See, e.g., In re: Thirty-Third Statewide Investigating Grand Jury*, 86 A.3d 204, 215 (Pa. 2014).

tension with the truth-determining process of the justice system," as they result in the exclusion of evidence. *Levy v. Senate of Pennsylvania*, 65 A.3d 361, 368 (Pa. 2013). Nevertheless, we have emphasized the need for protection of various types of communications though the establishment of privileges. Of these privileges, the attorney-client privilege is often considered "the most revered." *In re: Investigating Grand Jury of Philadelphia County*, 593 A.2d 402, 405 (Pa. 1991).

The attorney-client privilege as codified by the General Assembly, 42 Pa.C.S. § 5928, and applied by our courts is intended to foster open discussion between counsel and client. Only with full information from the client can an attorney provide relevant and sound legal advice. A client, however, will not reveal all necessary information to counsel if she fears that the information could later be disclosed.[27] Indeed, we have observed that application of the attorney-client privilege does not actually result in the loss of evidence in the truth-determining process because "the client would not have written or uttered the words absent the safeguards of the attorney-client privilege." *Levy*, 65 A.3d at 371 (quoting Paul R. Rice, *Attorney-Client Privilege in the United States,* § 2:3 (2012)).

In an often-cited explanation, the United States Supreme Court detailed that the purpose of the privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law

---

[27] This Court aptly described the rationale underlying attorney-client privilege over a century ago,

> [If the privilege did not apply], then a man about to become involved in complicated business affairs, whereby he would incur grave responsibilities, should run away from a lawyer rather than consult him. If the secrets of the professional relation can be extorted from counsel in open court, by the antagonist of his client, the client will exercise common prudence by avoiding counsel.

*National Bank of West Grove v. Earle,* 46 A. 268, 269; *see also Gillard*, 15 A.3d at 49.

and administration of justice." *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981); *see also Levy*, 65 A.3d at 368; *Gillard,* 15 A.3d at 47 n.1. While the absence of the privilege curtails frank discussion and the resulting legal advice, so too does uncertainty regarding the application of the privilege. We fully agree that "[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *Upjohn Co.*, 449 U.S. at 393, *see also Levy*, 65 A.3d at 371; *Gilliard*, 15 A.3d at 51 n.5. To decide whether to engage in communications, attorneys and clients must be able to predict whether those communications are protected by the privilege.

With this framework in mind, we consider the applicability of the *Garner* good cause analysis to Pennsylvania's attorney-client privilege in the context of a motion to dismiss derivative litigation pursuant to *ALI Principle* 7.13 as adopted by this Court in *Cuker*. We acknowledge that the *Garner* analysis is an understandable attempt to provide balance in the unusual scenario of derivative litigation where both the defendants, in the form of current management, and the plaintiffs, asserting claims for the benefit of the corporation, are attempting to speak for the corporation. At its most basic, the nine-factor analysis attempts to evaluate if derivative plaintiffs have created enough of a question regarding current management's actions to justify the withholding of the attorney-client privilege for the benefit of the corporation, as the true client.

We conclude that the *Garner* good cause analysis is inconsistent with the attorney-client privilege under Pennsylvania jurisprudence because it eliminates the necessary predictability of the privilege. Rather than providing clarity and certainty, the *Garner* test requires attorneys and clients to speculate how a court in the future will weigh the nine subjective and amorphous factors in an attempt to discern whether a derivative plaintiff has brought a sufficient claim to allow the abrogation of the current management's

assertion of the attorney-client privilege in regard to legal advice provided by the corporation's lawyers. The reality is that this weighing of the factors would result in current managers and the corporation's attorneys having no meaningful way of determining whether their otherwise privileged communications would be later divulged in derivative litigation discovery. As a result, corporate management would be less willing to discuss issues with corporate counsel, and corporate counsel would caution corporate management not to speak with her candidly. As a matter of simple logic, this will result in corporate managers being forced to act without necessary legal guidance in an already complicated legal environment. We conclude that this is inconsistent with the revered nature of the attorney-client privilege in Pennsylvania, and the clarity of it, which has been codified by our legislature and applied continuously by our courts. [28]

Moreover, we conclude that the *ALI Principles* adopted by this Court in *Cuker*, and specifically Section 7.13(e) addressing attorney-client privilege in regard to motions to dismiss derivative actions, provide an appropriate framework for derivative litigation, making the subjective *Garner* factors unnecessary.[29] This framework provides the derivative plaintiff with a path to challenge the validity of an independent committee's decision not to pursue derivative litigation and allows limited discovery, including some

[28] Our holding herein should be read against the facts and legal questions presented in the case currently before the Court, which solely concerns whether the Commonwealth Court was correct in remanding for a *Garner* good-cause analysis in a case where the current management of a corporation has filed a motion to dismiss the litigation based upon an independent committee's recommendation. Although we acknowledge that the consideration of whether *Garner* is consistent with Pennsylvania attorney-client privilege jurisprudence may have applicability in other scenarios, we reserve judgment on such questions, which deserve to be considered independently as they may well raise different considerations.

[29] As previously mentioned, *see supra* 6, n.3, the General Assembly has codified our adoption of the *ALI Principles* to some extent. We do not address the exact contours of the recently adopted provisions but generally recognize that the statutory provisions, like the *ALI Principles*, provide a framework to address the tensions inherent in derivative litigation.

privileged material which would otherwise not be permissible in standard litigation. Nevertheless, as noted, the *ALI Principles* protect the current management team through application of the business judgment rule, which has long been a part of Pennsylvania jurisprudence.

In addition to rejecting the *Garner* good cause analysis, we likewise decline to incorporate Section 85 of the *Restatement (Third) of the Law Governing Lawyers*, which, like *Garner*, utilizes a nebulous analysis of whether the plaintiffs' needs are "sufficiently compelling and the threat to confidentiality sufficiently confined to justify setting the privilege aside." *Restatement (Third) of the Law Governing Lawyers* § 85

### D. Applicability of the Fiduciary and Co-Client Exceptions

Regarding Derivative Plaintiffs' invocation of the fiduciary and co-client exceptions, we observe that Derivative Plaintiffs' argument is essentially based upon their claim that they are asserting the rights of the Foundation and the Corporation as clients in the attorney-client relationship to whom both Current Management and Derivative Plaintiffs owe a fiduciary duty as trustees or former trustees. We agree with the Commonwealth Court, however, that the derivative relationship involved in this case does not fit within the construct of either exception, as the Derivative Plaintiffs are neither owed a fiduciary duty by the corporate entities or Current Management nor were Derivative Plaintiffs co-clients with the corporate entities or Current Management. Rather than attempt to force the derivative fact pattern into these ill-fitting constructs, we instead utilize the procedures specifically designed for derivative litigation adopted by this Court in *Cuker*, which we view as providing the appropriate balance between protecting current management under the business judgment rule and allowing derivative plaintiffs to assert claims on behalf of the corporation.

### VI. Summary

Accordingly, we vacate the orders of the trial court and the Commonwealth Court. We additionally remand the matter to the trial court for reconsideration of Derivative Plaintiffs' motion to compel in a manner that is consistent with this opinion.

Chief Justice Saylor and Justices Donohue, Dougherty and Wecht join the opinion.

Justice Todd files a concurring and dissenting opinion.

Justice Mundy files concurring and dissenting opinion in which Justice Todd joins.