**[J-18-2020]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**


**BAER, C.J., SAYLOR, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | |
|---|---|
| IN RE: THE ESTATE OF WILLIAM K. MCALEER, DECEASED<br><br><br>APPEAL OF: WILLIAM MCALEER | : No. 6 WAP 2019<br>:<br>: Appeal from the Order of the<br>: Superior Court entered August 9,<br>: 2018 at No. 932 WDA 2017,<br>: quashing the appeal from the Order<br>: of the Court of Common Pleas of<br>: Allegheny County entered May 30,<br>: 2017 at No. 0334 of 2014.<br>:<br>: ARGUED:  May 27, 2020 |


*Justice Wecht delivers the Opinion of the Court with regard to Parts I and II(A),
and files an opinion in support of affirmance, joined by Justices Todd and
Dougherty, with respect to Parts II(B) and (C).*


**OPINION**


**JUSTICE WECHT**                                            **DECIDED: April 7, 2021**

This Court granted review to determine whether the attorney-client privilege and

the work product doctrine[1] may be invoked by a trustee to prevent the disclosure to a

beneficiary of communications between the trustee and counsel pertaining to attorney

fees expended from a trust corpus.  But to reach that issue, we first faced the question of

whether the Superior Court erred in disclaiming jurisdiction on the basis that the trial

court's order rejecting the privilege claim was not a collateral order, and immediately

reviewable as such.  For the reasons stated in Parts I and II(A) below, we hold

---

[1]     Although this matter involves invocation of both the privilege and the doctrine,
which are distinct legal concepts, the distinction is immaterial to our consideration of the
applicability of the fiduciary exception.  Thus, for purposes of this appeal, we refer to both
protections under the umbrella of the privilege.

unanimously that the Superior Court had immediate appellate jurisdiction to review the privilege question on the merits, and therefore erred in concluding otherwise. Accordingly, that court's quashal order is reversed.

As to the privilege issue itself, the Superior Court indicated that, notwithstanding its perceived lack of jurisdiction, there was no evidence by which to substantiate a claim of privilege on the merits, nor any argument presented to the trial court in support thereof. For those reasons, the court was left to conclude that the privilege was unavailable under the circumstances and that the communications at issue were subject to disclosure. This Court has not reached a consensus on whether the privilege may be invoked in the trust context.[2] Because disclosure would nevertheless result from the competing positions set forth by a majority of Justices, the lower court's alternative ruling is affirmed by operation of law.[3]

**I.**

William H. McAleer ("Trustee") is the sole trustee of a revocable living trust that was created on November 30, 2012, by his now-deceased father, William K. McAleer, for the benefit of Trustee and his two stepbrothers, Stephen and Michael Lange ("Beneficiaries"). Following the elder McAleer's death on May 4, 2013, Trustee filed a first and partial accounting of the trust in March 2014, to which Beneficiaries filed twenty-one objections, challenging certain aspects of the administration of the trust and seeking disclosure of information pertaining to a number of bank accounts. As a consequence of

---

[2] This author would hold that those protections are unavailable to a fiduciary in this setting, for the reasons set forth below in Parts II(B) and (C). Justice Saylor and Justice Donohue each write separately to set forth a basis for reaching the contrary result.

[3] *See Creamer v. Twelve Common Pleas Judges*, 281 A.2d 57, 58 (Pa. 1971) ("The principle is well established in this Commonwealth as well as many other jurisdictions that, when an appellate court is equally divided, the judgment, order or decree of the court below will be affirmed.").

Beneficiaries' challenges, Trustee retained the services of two law firms, Julian Gray Associates ("Gray") and K&L Gates, to respond.[4] The probate court ultimately dismissed the objections with prejudice following an evidentiary hearing in March 2016.[5]

Although none of the objections pertained specifically to legal expenses, Trustee's filings indicated that roughly $124,000 had been expended from the trust for attorney fees and costs through December 2015, prompting Beneficiaries to file a petition for special relief to determine the reasonableness of those expenses.[6] In response, the probate court froze further disbursements of trustee and legal fees from the trust corpus absent prior judicial authorization, and subsequently denied Trustee's motion for reconsideration.[7]

In August 2016, Trustee filed a second and final accounting. On November 14, 2016, Beneficiaries filed ten objections, contending, *inter alia*, that Trustee had paid

---

[4] Gray previously served as estate planning counsel for Trustee's father for several years prior to his death. According to Trustee, K&L Gates was engaged to respond to separate objections filed by Beneficiaries against the Estate of William K. McAleer "for financial transactions that occurred prior to the Decedent's death." Response to Objections to Second and Final Account, 12/14/2016, at ¶ 8(b). At Trustee's request,

> K&L Gates also served as primary counsel in an attempt to negotiate a comprehensive settlement with [Beneficiaries] for claims filed against both the Estate and the Trust. K&L Gates was selected as counsel for these matters as K&L Gates had represented Decedent on personal, business and estate matters in the past, and this would also save fees in bringing a new counsel up to speed on Decedent's Estate and business matters.

*Id.*

[5] Order, 3/29/2016.

[6] Motion to Strike Restated Objections to First and Partial Account, 2/12/2016, ¶ 10(a) ("Trust expenses for attorney fees incurred from February 1, 2014 through December 31, 2015 total $124,417.27.").

[7] *See* Orders, 4/22/2016 and 5/20/2016, respectively.

unreasonable and excessive trustee and attorney fees from the trust.[8] Trustee's response included the general assertion that he was "under no obligation to provide [O]bjectors with copies of legal invoices as they are protected by attorney/client privilege," along with a detailed explanation of the circumstances necessitating the litigation expenses.[9] Deviating slightly from his prior representations, Trustee averred that "[t]he amount of legal fees incurred by the Trust to respond to [Beneficiaries'] baseless objections totals $123,170.67. Of this total, the fees of Julian Gray Associates were $49,413.46. The fees of K&L Gates were $73,757.21."[10]

On March 2, 2017, Beneficiaries served a request for production of documents, including billing statements for all trustee and attorney fees included in the second and final accounting. That same day, Trustee served Beneficiaries with his own request for production of documents relating to their legal expenses. Notwithstanding this dueling discovery demand, Trustee filed no formal objections to Beneficiaries' request. Pertinently, Trustee initially provided substantially redacted copies of the attorney invoices from Gray only.[11] Two hundred twenty-three of the Gray entries were blacked out, with notations for attorney-client privilege and work product doctrine appended as reasons for the redactions. Thereafter, Trustee produced billing statements from K&L Gates, with 98% of the billings similarly redacted. Unsatisfied with Trustee's discovery efforts, on May 8, 2017, Beneficiaries moved for an order compelling discovery.[12]

---

[8] *See* Objections to Second and Final Account, 11/14/2016, ¶¶ 8(a)-(d).

[9] Response to Objections to Second and Final Account, 12/14/2016, ¶¶ 6, 8(b).

[10] *Id.* ¶ 8(c).

[11] In disclosing the invoices of his trustee expenses, Trustee produced a privilege log with descriptions of the redacted entries. Notes of Testimony ("N.T."), 5/18/2017, at 7.

[12] On May 10, 2017, Trustee moved to compel Beneficiaries to produce all legal bills and invoices issued by and paid to three successive attorneys and law firms employed in

At a hearing ten days later before the Honorable Kathleen A. Durkin in the Court of Common Pleas of Allegheny County, Trustee's counsel reiterated Trustee's invocation of the privilege and doctrine. Although Trustee's counsel admitted that she could not "speak for K&L Gates bills because they belong to K&L Gates" and that she had "no knowledge of" those bills, she noted that the redacted time sheets for both firms bore corresponding notations for "protected information litigation" and "confidential [communications] with counsel relating to the litigation matters, not relating to the trust administration or trust management."[13]

Trustee's counsel also quoted this Court's holding in *Levy v. Senate of Pennsylvania*, 65 A.3d 361 (Pa. 2013), that "descriptions of legal services that address the client's motive for seeking counsel, legal advice, strategy or other confidential communications are undeniably protected under the attorney client privilege."[14] Referencing the inspection procedure utilized in *Levy*, Trustee's counsel offered that the court could review the documents *in camera* if it "felt that more information was needed."[15] Beneficiaries' counsel agreed that the court "need[ed] to look at it,"[16] but it does not appear that Judge Durkin accepted the parties' offer. Following the hearing, the court ordered Trustee to forward unredacted invoices to Beneficiaries within thirty days.[17]

---

their years-long litigation efforts. Trustee's Motion to Compel, 5/10/2017. Trustee also moved to release $5,531.87 from the trust "as partial payment [to Gray] for legal costs incurred to date by Trust counsel in responding to [Beneficiaries'] continued litigation." Motion to Release Trust Funds to Pay Portion of Legal Fees, 5/13/2017, at 3.

[13] *See* N.T., 5/18/2017, at 5-7, 8-9.

[14] *Id.* at 9 (quoting *Levy*, 65 A.3d at 373).

[15] *Id.* at 10.

[16] *Id.* at 12.

[17] Order, 5/30/2017.

Trustee did so only for the trustee invoices, but filed an interlocutory appeal as to the attorney invoices, asserting attorney-client and work product protections.

In its Pa.R.A.P. 1925(a) opinion, the court explained that a party seeking to assert a privilege first must set forth facts to establish that the privilege is properly invoked. Opinion, 7/11/2017, at 1 (citing *Custom Designs & Manuf. Co. v. Sherwin-Williams Co.*, 39 A.3d 372, 376 (Pa. Super. 2012)). While Trustee had made a "general argument" as to the Gray billings, the court noted that Trustee's counsel specifically stated that she could not speak for the K&L Gates bills. The court thus concluded that Trustee had presented no facts to establish the propriety of the invocation of the privilege. Additionally, the court reasoned that when a trustee obtains legal advice relating to a trust, that advice must be shared with the beneficiaries. *Id.* at 2 (citing *Follansbee v. Gerlach*, 56 Pa. D. & C. 4th 483, 2002 WL 31425995 (C.C.P. Allegheny 2002)). Ultimately, because Beneficiaries effectively had paid for the legal services rendered to Trustee, Judge Durkin determined that they should be entitled to see the bills that are the subject of this dispute to determine whether those bills were reasonable. Trustee appealed.

In a unanimous opinion, the Superior Court quashed Trustee's appeal. *In re Estate of McAleer*, 194 A.3d 587 (Pa. Super. 2018). The panel began by addressing whether the trial court's order was appealable under our Rules of Appellate Procedure. *Id.* at 591-93. After concluding that the order was not final under Rule 341, that an interlocutory appeal was not available as of right under Rule 312, and that Trustee had not sought permission to appeal under Rule 312, the court homed in on the collateral order doctrine. *See* Pa.R.A.P. 313.[18] For an order to be appealable under Rule 313(b), the panel noted,

---

[18] Rule 313 defines a "collateral order" as "an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." Pa.R.A.P. 313(b).

it must satisfy three conditions: "(1) the order is separable from the main cause of action; (2) the right involved is too important to be denied review; and (3) the claim would be irreparably lost if review is postponed." *McAleer*, 194 A.3d at 593 (quoting *J.S. v. Whetzel*, 860 A.2d 1112, 1116 (Pa. Super. 2004)). Initially, the court observed that the order appealed here related to the merits of Beneficiaries' underlying claims and, therefore, was inseparable from the main cause of action. Consequently, the court determined that the first prerequisite had not been met. Because all three factors must be satisfied, the panel concluded that the instant appeal was not taken from a collateral order. *Id.* at 594.

"However," the court continued, "discovery orders involving privileged material are nevertheless appealable as collateral to the principal action pursuant" to Rule 313. *Id.* (quoting *Estate of Moskowitz*, 115 A.3d 372, 389 (Pa. Super. 2015)). The panel then proceeded to discuss a burden-shifting paradigm when claims of privilege are at issue, with the party asserting the privilege bearing the initial burden of setting forth facts establishing that the privilege properly has been invoked. *Id.* (quoting *Nationwide Mut. Ins. Co. v. Fleming*, 924 A.2d 1259, 1267 (Pa. Super. 2007) ("If the party asserting the privilege does not produce sufficient facts to show that the privilege was properly invoked, then the burden never shifts to the other party, and the communication is not protected under attorney-client privilege.")); *see id.* at 595 ("Likewise, the same burden applies to a party seeking to invoke the protections of the work-product doctrine.").

The court also considered a trustee's duty to furnish information pursuant to Section 82 of the Third Restatement of Trusts, which excepts from disclosure communications with counsel for the trustee's personal protection in the course of, or in anticipation of, litigation. *Id.*; *see* RESTATEMENT (THIRD) OF TRUSTS § 82, cmt. f (2007). The panel noted that the predecessor of Section 82, Section 173 of the Second Restatement, was examined in *In re Estate of Rosenblum*, 328 A.2d 158 (Pa. 1964), in

which this Court indicated that the beneficiary of a trust is distinct from other litigants seeking discovery, because the former's right of inspection arises from its property in the trust estate and can be exercised independently of any litigation. *McAleer*, 194 A.3d at 595-96 (quoting *Rosenblum*, 328 A.2d at 164-65 ("The right of access to trust records is an essential part of a beneficiary's right to complete information concerning the administration of the trust.")). Borrowing heavily from *Rosenblum*, the panel added that:

> It places [the beneficiaries of a trust] on a different footing from other litigants who seek discovery of documents under our Rules of Civil Procedure. A beneficiary's right of inspection has an independent source in his property interest in the trust estate, and the right may be exercised irrespective of the pendency of an action or proceeding in court.

*Id.* at 596 (quoting *Rosenblum*, 328 A.2d at 165 (noting that Section 173 "is declaratory of the common law of Pennsylvania")) (cleaned up).

Turning to the present case, the panel explained:

> Our review of the record reflects that, prior to the trial court's order compelling [Trustee] to produce the discovery documents in question, [Trustee] did not provide any facts to support his attempt to invoke the attorney-client privilege and work-product doctrine protections. [Trustee] never filed an objection to [Beneficiaries'] discovery request in which he could have raised those protections. Instead, [Trustee] simply replied to the discovery request by presenting [Beneficiaries] with substantially redacted copies of attorney invoices. [Beneficiaries] then filed a motion to compel discovery, to which [Trustee] failed to respond or object. Rather, [Trustee's] first attempt to invoke the protections was during oral argument at a hearing in response to the motion to compel . . . . At the hearing, [Trustee's] counsel mentioned the attorney-client privilege and the work-product doctrine as justification for redacting the documents provided to [Beneficiaries]. However, [Trustee] failed to set forth specific facts to show that either the attorney-client privilege or the work product doctrine was applicable and properly applied.

*Id.* at 596 (citations omitted). Because Trustee had not offered factual support for his claims of privilege before the trial court, the Superior Court determined that appellate review was precluded. *See id.* at 596-97.

Likewise, given the lack of a factual predicate for Trustee's claims, the court held that he had not established the applicability of Section 82's protections. *See id.* at 597 ("[Trustee] neither argued nor presented evidence to establish that the redacted information pertained to communications from counsel retained for [Trustee's] personal protection in the course of litigation. Accordingly, there is no evidence that the information qualifies as privileged under comment f . . . ."). Thus, the panel "conclude[d] that the information in the attorney invoices qualifies as communications subject to the general principle entitling a beneficiary to information reasonably necessary to the prevention or redress of a breach of trust or otherwise to the enforcement of the beneficiary's rights under the trust." *Id.*

## II.

We granted allowance of appeal in order to address the following question:

> Do the attorney-client privilege and work product doctrine[] protect communications between a trustee and counsel from discovery by beneficiaries when the communications arose in the context of adversarial proceedings between the trustee[] and beneficiaries?

*In re Estate of McAleer*, 201 A.3d 724 (Pa. 2019) (*per curiam*). The authority to determine the scope of a common-law privilege appropriately rests with this Court under Article V, Section 10(c), of the Pennsylvania Constitution. PA. CONST. art. V, § 10(c); *Gillard v. AIG Ins. Co.*, 15 A.3d 44, 58 (Pa. 2011). As the question before us is one of law, our standard of review is *de novo* and its scope is plenary. *See Levy*, 65 A.3d at 367.

## A.

Beneficiaries maintain that Trustee's appeal should be quashed as interlocutory because it fails the three-prong test for immediate review as of right. They contend that the reasonableness of the disputed fees was the primary issue below, and that it was not separable from the principal cause of action. Beneficiaries assert that, in response to their discovery request seeking production of documents showing itemized fees paid from

the trust, Trustee declined to seek a protective order in which he could have averred facts in support of his position, but instead produced incomplete, redacted statements under a general claim of privilege. Although Trustee reiterated that general claim at argument with respect to the Gray billings, Beneficiaries emphasize that he proffered no similar grounds in relation to the K&L Gates fees. Thus, they claim, the trial court and Superior Court correctly ruled that Trustee had failed to set forth sufficient facts to demonstrate that the attorney-client privilege or work product doctrine applied.

Trustee argues that whether the redacted portions of the invoices were protected by privilege was a wholly collateral question. He notes that Beneficiaries raised more than thirty distinct, substantive objections to the administration of the trust, of which the fee dispute was merely one. This Court should reject the panel's determination that the matter is not collateral, he contends, for two reasons: "(1) the Court's view of the 'issue' on appeal is too broad; and (2) the dispute between the parties below is not centered around the question of fees." Trustee's Brief at 19. Trustee argues that if immediate review is unavailable, disclosure would render its privilege irreparably lost. "[O]nce the confidentiality is vitiated, the materials in question can never again become confidential." *Id.* at 22.[19] Since disclosure would provide Beneficiaries insight into Trustee's legal inquiries and litigation strategy, Trustee asserts that collateral review is essential. *Id.* at 23.

"[D]iscovery orders rejecting claims of privilege and requiring disclosure constitute collateral orders that are immediately appealable under Rule 313." *Commonwealth v. Flor*, 136 A.3d 150, 155 (Pa. 2016). Because an invocation of Rule 313 implicates "this Court's jurisdiction to entertain an appeal of" a challenged order, we must independently

---

[19] *See id.* (quoting *Alexander v. Queen*, 97 A. 1063, 1065 (Pa. 1916) ("Without such a privilege the confidence between client and advocate, so essential to the administration of justice would be at an end.")).

determine whether the collateral order doctrine applies. *Commonwealth v. Kennedy*, 876 A.2d 939, 943 (Pa. 2005). We find that it does.

Of the doctrine's three prerequisites, the separability prong presents the closest question here. "An order is separable from the main cause of action if it can be resolved without an analysis of the merits of the underlying dispute." *Commonwealth v. Williams*, 86 A.3d 771, 781 (Pa. 2014). Because "some interrelatedness with the main issue is tolerable," *id.*, a court must assess whether an issue "is conceptually distinct" from the primary cause of action, *Pridgen v. Parker Hannifin Corp.*, 905 A.2d 422, 433 (Pa. 2006) (quoting *Johnson v. Jones*, 515 U.S. 304, 314 (1995)). We have described our "approach when reviewing separability" as a "practical" one. *Williams*, 86 A.3d at 781.

Trustee asserts that the principal issue below was the winding up of decedent's estate. But that process necessarily involves an evaluation of fees paid from the trust corpus when the propriety of those disbursements is called into question. Trustee emphasizes that only one of the thirty-one challenges lodged by Beneficiaries involved a dispute over attorney fees. While the number and variety of claims are noteworthy in a probate matter, those facts are not dispositive. Here, Beneficiaries' twenty-one initial challenges were raised before Trustee disclosed the more than $123,000 in attorney fees he paid to Gray and K&L Gates from the trust corpus. With new facts in hand, Beneficiaries immediately filed a petition for special relief pertaining to those expenses, and subsequently filed ten additional challenges to Trustee's second and final accounting, one of which addressed those costs. Trustee avers that many of those expenses arose in the context of adversarial legal proceedings initiated by Beneficiaries, some of which accumulated as a direct result of their delay in returning estate property for valuation. Given the scale of the fees vis-à-vis the remainder of the disputed trust funds, it would be

odd to conclude that those expenses were not central to the dispute, or that they did not become a central concern upon their revelation.

Despite the attorney fees' importance to the ultimate resolution of the probate matter, however, their propriety is conceptually distinct from the fundamental question of whether a party even can invoke the protections of the attorney-client privilege to prevent disclosure of fee information in the context of trust administration. We need not evaluate the merits of the underlying dispute in order to resolve the purely legal question before us. Those factual matters largely are irrelevant in the face of the weighty issues of privilege in appeals taken pursuant to Rule 313. Indeed, we have consistently distinguished assertions of privilege from the substance of the underlying causes of action. *See Ben v. Schwartz*, 729 A.2d 547, 552 (Pa. 1999) ("[I]ssues of privilege . . . can be addressed without analysis of [] alleged negligence."); *Commonwealth v. Harris*, 32 A.3d 243, 249 (Pa. 2011) (same); *Melvin v. Doe*, 836 A.2d 42, 46 (Pa. 2003) ("[C]onsideration of what threshold requirements must be imposed as a prerequisite to discovery in an anonymous defamation case . . . is plainly separable from the defamation action."). We see no reason to depart from that authority today.

As to the second and third prongs, it is well-settled that the right involved—the protection of confidentiality inherent in the privilege—is too important to be denied review and would be irreparably lost if review is postponed until after final judgment. *Ben*, 729 A.2d at 552; *Commonwealth v. Dennis*, 859 A.2d 1270, 1278 (Pa. 2004). Accordingly, this matter was immediately appealable pursuant to the collateral order doctrine, and the Superior Court erred in quashing Trustee's appeal.[20]

---

[20]     Given this Court's even division on whether the attorney-client privilege should be available to a trustee who pays attorney fees from a trust corpus, we need not dwell on whether Trustee invoked the protections of the privilege with sufficient specificity here. However, we reaffirm that, in contexts where the privilege is available, a party's obligation

**B.**

It is an "ancient proposition of law" that "'the public . . . has a right to every man's evidence,'" save for those individuals who are "protected by a constitutional, common law, or statutory privilege." *United States v. Nixon*, 418 U.S. 683, 709 (1974) (quoting *United States v. Bryan*, 339 U.S. 323, 331 (1950)).  "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981) (citing 8 J. WIGMORE, EVIDENCE § 2290 (McNaughton rev. 1961)).  Grounded in "the interest and administration of justice," the privilege recognizes the necessity of confidential pursuits of legal assistance "free from the consequences or the apprehension of disclosure." *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888).  Though a mainstay of our legal system, the privilege is not absolute.[21] Because it "has the effect of withholding relevant information from the factfinder," courts construe the privilege narrowly to "appl[y] only where necessary to achieve its purpose." *Fisher v. United States*, 425 U.S. 391, 403 (1976).  Where the interests protected by the privilege conflict with weightier obligations, the former must yield to the latter.  This appeal concerns one such conflicting duty: that of a fiduciary to furnish trust-related information to beneficiaries.

Under the so-called "fiduciary exception," the origins of which can be traced to mid-nineteenth century English trust cases,[22] "a trustee who obtains legal advice related to

---

to satisfy the dictates of Rule 313 is not waived simply because a discovery order is appealed based upon general claims of privilege.  *See Williams*, 86 A.3d at 780.

[21]    *See, e.g., Clark v. United States*, 289 U.S. 1, 15 (1933) (examining the crime-fraud exception); *Tracy v. Tracy*, 105 A.2d 122, 125 (Pa. 1954) (discussing the joint-client exception).

[22]    In tracing the history of the fiduciary exception from those English cases, the United States Court of Appeals for the Third Circuit explained:

the execution of fiduciary obligations is precluded from asserting the attorney-client privilege against beneficiaries of the trust." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 167 (2011). Jurisdictions that recognize the exception largely rely upon the theory that a fiduciary's duty to administer a trust solely for the benefit of its beneficiaries prevails over the privilege. Because "trustees are tasked with providing beneficiaries with information regarding the management of the trust," *Pittsburgh History & Landmarks Found. v. Ziegler*, 200 A.3d 58, 61 n.2 (Pa. 2019), communications between a fiduciary and counsel regarding trust administration must serve to benefit the beneficiaries, and thus are subject to disclosure.

The first American case to consider the exception, *In re Prudence-Bonds Corp.*, 76 F. Supp. 643 (E.D.N.Y. 1948), reached a different result than the English precedents. There, the Guaranty Trust Company of New York—which, in 1920, had become the trustee of the Prudence-Bonds Corporation, First Mortgage Collateral Bonds, Series A Trust—petitioned the federal district court for a judicial settlement and discharge of its duties with respect to the trust following its transfer to a successor trustee, City Bank Farmers Trust Company, in 1938. When City Bank objected to Guaranty's first accounting, the matter was transferred to a special master. Guaranty later filed an amended accounting covering its eighteen-year administration of the trust, which prompted City Bank to file amended objections "point[ing] to specific alleged acts . . .

> Under English common law, when a trustee obtained legal advice relating to his administration of the trust, and not in anticipation of adversarial legal proceedings against him, the beneficiaries of the trust had the right to the production of that advice. The theory of the rule was that the trustee obtained the advice using both the authority and the funds of the trust, and that the benefit of advice regarding the administration of the trust ran to the beneficiaries.

*Wachtel v. Health Net, Inc.*, 482 F.3d 225, 231-32 (3d Cir. 2007) (citing *In re Mason*, 22 Ch. D. 609 (1883); *Talbot v. Marshfield*, 62 Eng. Rep. 728, 729 (1865); *Wynne v. Humberston*, 54 Eng. Rep. 165 (1858)).

dealing with the securities of the Trust" and seeking "to surcharge [Guaranty] for a very large sum." *Id.* at 644.

Beginning in 1920, Guaranty, considered "one of the large and important trust companies of the United States," retained the services of the predecessor firms of what is now Davis Polk & Wardwell LLP ("Davis Polk"), to assist with its trust portfolio. *Id.* Throughout the ensuing decades, the firm provided "several hundred opinions, oral and written, . . . on a great number of different and unrelated matters." *Id.* By a number of interrogatories addressed to Guaranty, City Bank sought to obtain for inspection "all legal opinions" issued by Davis Polk "prior to June 29, 1934, received in connection with, and to guide [Guaranty] in, the whole administration of the Trust." *Id.* at 645.[23] Guaranty moved to strike the first interrogatory, which the federal district court granted on October 11, 1945. *Id.* After Guaranty waived privilege as to one opinion by introducing it at a subsequent hearing, City Bank renewed its broader production demand. *Id.* Invoking the earlier English decisions, the special master granted City Bank's request.

Straining to distinguish those cases, the federal district court reversed the special master's order, emphasizing "the far more important question of privilege of counsel," which it considered to be

> plainly vitally important to the rights of the client, the attorneys, the debtor and the bondholders in the proper administration of the law and the Trust, and the right of both the Trustee and its attorneys to have advice given when

---

[23]     In addition to the legal opinions themselves, City Bank requested that Guaranty produce information regarding

> when such opinions were obtained, the names of the attorneys rendering such opinions, the names of directors and officers and employees of the Trustee who requested the same, and to furnish copies of such opinions, correspondence, memoranda or records relating thereto, or state whether inspection by [City Bank] of any of the above things would be made available.

*Prudence-Bonds*, 76 F. Supp. at 645 (quoting Interrogatory No. 1).

called upon without the fear of possible future annoyance and cross-examination should the acts of the client not meet with the approval of some bondholder, who in the future sought in some way to sustain a criticism of an act.

*Id.* at 646. Weighing these competing interests, the court simply could "not agree that anyone who, during the years, bought a bond or an interest in a bond, thereby made the counsel for the Trustee its attorney or employee." *Id.* Otherwise, the bondholders "could then possibly embarrass or inconvenience" those attorneys based upon "some action of their real client, the Trustee, or simply because, from time to time, the Trustee properly paid its lawyers for some of their services from the assets of the Trust." *Id.* Although the court conceded that "a different situation entirely [would be] presented where the client asserts a reliance on an opinion . . . offered in evidence as exculpation for its" fiduciary acts, that scenario was not before it. *Id.* Given the dearth of case law on the subject—and in view of the apparently herculean efforts needed to respond to the discovery request—the court reaffirmed its earlier order striking the production demand. *Id.* at 647.

More than two decades after its initial failure to launch, the fiduciary exception secured a foothold in the 1970s when it was recognized by several federal courts, though not initially within the trust context.[24] In the seminal decision *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970), the United States Court of Appeals for the Fifth Circuit borrowed from the rationale of the English cases to resolve a shareholders' derivative action alleging breach of fiduciary duties. The court began by eschewing "[c]onceptualistic phrases describing the corporation as an entity separate from its stockholders" as useless "tools of analysis," reasoning that "[t]hey serve only to obscure the fact that management has duties which run to the benefit ultimately of the stockholders." *Id.* at 1101.

---

[24] For federal decisions recognizing the exception as applied to trustee-beneficiary relations, see *Comegys v. Glassell*, 839 F. Supp. 447, 448-49 (E.D. Tex. 1993), and *Parker v. Stone*, 2009 WL 1097914 (D. Conn. Apr. 21, 2009) (unreported).

In the *Garner* Court's view, when corporate managers procure the advice of counsel in performance of their duties as fiduciaries, the shareholder-plaintiffs are the ultimate beneficiaries of the advice. *See id.* ("[I]t must be borne in mind that management does not manage for itself."). As such, shareholders may not be barred absolutely from discovering that advice during litigation by assertions of the attorney-client privilege. The court explained:

> The attorney-client privilege still has viability for the corporate client. The corporation is not barred from asserting it merely because those demanding information enjoy the status of stockholders. But where the corporation is in suit against its stockholders on charges of acting inimically to stockholder interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance.

*Id.* at 1103-04. Other federal courts have adopted this analysis.[25]

In contrast to *Garner*'s case-by-case "good cause" approach, the first state court decision to adopt the fiduciary exception within the trustee-beneficiary relationship, *Riggs National Bank of Washington, D.C. v. Zimmer*, 355 A.2d 709 (Del. Ch. 1976), presents a useful case study of the exception's categorical applications. There, beneficiaries of a trust sought "to compel the trustees to reimburse the estate for alleged breaches of the trust in regard to certain tax matters." *Id.* at 710. The beneficiaries filed a discovery motion seeking the production of a legal memorandum prepared by an attorney at a firm hired by the trustees. Endeavoring to withhold the requested communication, the trustees, as here, contended that the document was protected by the attorney-client

---

[25]     *See Fausek v. White*, 965 F.2d 126, 129-30 (6th Cir. 1992) (adopting the *Garner* approach); *cf. Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1415-16 (11th Cir. 1994) (assuming *Garner*'s applicability, *arguendo*, but denying discovery based "on the facts of" the class action suit against an international union).

privilege and work product doctrine, because it was "prepared in connection with potential litigation with the State of Delaware." *Id.*

To resolve the dispute, the Delaware Court of Chancery focused on two issues: (1) "the purpose for which [the memorandum] was prepared," and (2) "the party or parties for whose benefit it was procured, in relation to what litigation was then pending or threatened." *Id.* at 711. Addressing the second question initially, the court observed that:

> At the time [the memorandum] was prepared the litigation which was then pending was a petition for instructions, the very nature of which normally indicates that the trustees were not implicated in any way. There was also the possibility of potential litigation against the State of Delaware, Division of Revenue. Both of these actions suggest that the legal assistance to the trustees would be rendered only in their service to the beneficiaries. In both instances, *the ultimate or real clients were the beneficiaries of the trust*, and the trustee, . . . in his capacity as a fiduciary, was, or at least should have been, acting only on behalf of the beneficiaries in administering the trust.

*Id.* (emphasis added). Although no proceedings had been contemplated "requiring the trustees to seek legal advice personally," the fact that the trustee paid the law firm "out of the trust assets" was "a significant factor, not only in weighing ultimately whether the beneficiaries ought to have access to the document, but also [because] it is in itself a strong indication of precisely who the real clients were." *Id.* at 711-12. Reasoning that "the legal services were performed at the request of the trustee for the benefit of the beneficiaries of the trust," the court warned that, "were this not the case, it may have been improper to charge the trust estate with [the] cost of the legal services." *Id.* at 712 (citing *Bankers Trust Co. v. Duffy*, 295 A.2d 725, 726 (Del. 1972) (indicating "two situations in which an allowance from a trust corpus for attorneys' fees may be made: when the attorneys' services were necessary for the proper administration of the trust . . . or where the services otherwise resulted in a benefit to the trust") (citations omitted)).

Moreover, the court noted the "substantive fiduciary duties" owed by trustees to beneficiaries, which it deemed "most important[]" in permitting the latter "to inspect

documents prepared by an attorney on their behalf." *Id.* The court looked to the above-cited English common-law trust decisions as well as American treatises like the Second Restatement of Trusts, acknowledging the parties' agreement that "American case law [was] practically nonexistent on the duty of a trustee in this context" as of 1976. *Id.* Observing that "Delaware is a State with a strong English common law tradition," the court considered the persuasive value of those decisions "perhaps [to] have more weight [in Delaware] than elsewhere." *Id.* The court then roundly rejected the rationale of *Prudence-Bonds*, distinguishing that decision on two grounds. First, in the court's judgment, "the English authority . . . puts the proper emphasis on fiduciary responsibility," which it considered "especially appropriate in the private testamentary trust" scenario that was not present in the New York case. *Id.* at 714. "Secondly, as the *Prudence-Bonds* opinion itself recognized, the factual situation was distinguishable from the typical trust" case because it "involved an indenture trustee for an issue of corporate bonds," which rendered resolving the dispute "more difficult, due to multiple interests involved." *Id.*

Returning to the traditional principles upon which the attorney-client privilege and the work product doctrine are grounded, the court differentiated the trust context, reiterating that "the trustee is not the real client," nor are the beneficiaries "simply incidental beneficiaries who [c]hance to gain from the professional services rendered." *Id.* at 713. Rather, "[t]he very intention of the [attorney-client] communication is to aid the beneficiaries." *Id.* at 713-14. Thus, trustees "cannot subordinate the fiduciary obligations owed to the beneficiaries to their own private interests under the guise of attorney-client privilege." *Id.* at 714. Opining that "a beneficiary's interest in the trust affairs ought to be encouraged rather than thwarted and the trustee's duty in that respect should be characterized by complete and continuing openness," *id.* at 712-13, the court determined that "[t]he policy of preserving the full disclosure necessary in the trustee-beneficiary

relationship is here ultimately more important than the protection of the trustees' confidence in the attorney for the trust," *id.* at 714.  With this balance in mind, the court declined to override "a clearly desirable rule of substantive trust law" in the face of the asserted "privileges . . . and the policies supporting them."  *Id.* at 713.[26]

Although the fiduciary exception largely has been adopted by the federal courts, particularly in shareholder derivative and ERISA litigation,[27] its reception in state courts

---

[26]    More than four decades after *Riggs* was decided, the Delaware General Assembly promulgated DEL. CODE ANN. tit. 12, § 3333, providing that a fiduciary may assert attorney-client privilege to shield communications relating to "any claim that has or might be asserted against the fiduciary," regardless of the source of payment for attorney fees.  *Id.* § 3333(a).  While Justice Donohue is correct that this statute seems to call *Riggs*' continuing vitality into question, Op. Supporting Reversal ("OSR") at 6 n.3 (Donohue, J.), the Supreme Court of Delaware has not had occasion to reconsider its common-law precedent on the fiduciary exception since Section 3333's enactment in 2007.  However, at least one chancery court in that State has concluded that "*Riggs* continues to be the law in Delaware," albeit in an unpublished master's report.  *Mennen v. Wilmington Trust Co.*, Del. Ch. C.A. No. 8432-ML, Legrow, M., 2013 WL 4083852, *4 (July 25, 2013) (Report); *id.* at *3 ("[T]he reasoning in *Riggs* was not superseded or abrogated by subsequent changes to Delaware law.").

[27]    Beginning with *Donovan v. Fitzsimmons*, 90 F.R.D. 583 (N.D. Ill. 1981), federal courts over the past forty years primarily have recognized the fiduciary exception as applied to claims brought by employee benefit plan participants alleging breaches of fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.  See, e.g.*, *In re Long Island Lighting Co.*, 129 F.3d 268, 271 (2d Cir. 1997) (referring to the fiduciary exception as a "settled common-law principle[]"); *Solis v. Food Emp'rs Labor Relations Ass'n*, 644 F.3d 221, 228 (4th Cir. 2011); *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 645 (5th Cir. 1992); *United States v. Evans*, 796 F.2d 264, 265-66 (9th Cir. 1986) (*per curiam*); *Washington-Balt. Newspaper Guild, Local 35 v. Washington Star Co.*, 543 F. Supp. 906, 909 (D.D.C. 1982).  These courts typically have set forth two different theories for applying the exception under ERISA.  The first rationale is predicated upon the duties of disclosure discussed in *Garner*.  Essentially, because fiduciaries have a duty to disclose material information to retirement plan beneficiaries, matters communicated by the fiduciary to the attorney should also be disclosed to plan participants in the first instance.  The second is that, because a plan fiduciary acts for the benefit of plan beneficiaries, the participants are considered the "real" clients of the fiduciary's lawyer.  Thus, when an ERISA fiduciary seeks legal advice in fulfillment of fiduciary responsibilities, the plan beneficiaries are entitled to see the attorney's communications with the fiduciary, who serves as their representative.  *But see Wachtel* 482 F.3d at 236 (declining "to impose trustee-like disclosure obligations upon" ERISA

since *Riggs* has been mixed. Two years after *Riggs*, the Supreme Court of Arkansas recognized a variant of the exception, under which the beneficiaries of a will would be considered "joint clients" of the executor or administrator's attorney, such that neither could invoke the attorney-client privilege against the other to shield testimony related to the reasonableness of an executor's fee that was to be paid out of the estate. *Estate of Torian v. Smith*, 564 S.W.2d 521, 526 (Ark. 1978). The Supreme Court of Washington, citing disputes over the reasonableness of attorney fees in probate matters, similarly concluded that "the fiduciary duties of [an] attorney run not only to the personal representatives [of an estate] but also to the heirs," yet did not explicitly adopt the exception. *In re Estate of Larson*, 694 P.2d 1051, 1054 (Wash. 1985).[28]

The high-water mark for state court adoption of the fiduciary exception came in 1988, when the Third Department of the Appellate Division of the New York Supreme Court recognized it as part of New York common law. In *Hoopes v. Carota*, 531 N.Y.S.2d 407 (N.Y. App. Div. 1988), beneficiaries of three private trusts, which together owned a majority of the voting stock in a paper manufacturing company, attempted to remove the trustee, who also served as the corporation's chief executive officer and as a member of the corporation's board of directors, for breach of his fiduciary duties. During his deposition, the trustee-CEO repeatedly invoked attorney-client privilege when asked whether he consulted counsel regarding certain transactions, such as his participation in a proposed leveraged buyout or sale of the company, among other things. After the trial

---

insurers because their "limited fiduciary obligations under ERISA . . . are not coextensive with the common law obligations of a trustee").

[28]     *But see Roberts v. Fearey*, 986 P.2d 690, 694 (Or. Ct. App. 1999) ("[W]hen an attorney undertakes to represent a fiduciary, he or she represents only the fiduciary and does not, at the same time, maintain an attorney-client relationship with those to whom the fiduciary-client owes a duty.").

court granted the beneficiaries' motion to compel the trustee's responses to those questions, he appealed. *Id.* at 408.

Highlighting the appellant's dual roles as trustee and CEO, the intermediate appellate court found that he owed a fiduciary duty to the appellees and thus "was not entitled to shield absolutely from his beneficiaries the communications between him and his attorneys regarding pertinent affairs of the trust and of the corporation." *Id.* at 409. In doing so, the court recognized the competing approaches to the fiduciary exception presented in *Riggs* and *Garner*. The court passed over *Riggs*' categorical approach for *Garner*'s "case-by-case analysis," which in its view "appear[ed] to be more consistent with the approach to attorney-client privilege issues adopted by the Court of Appeals," New York's high court. *Id.* at 410. Concluding that good cause had been shown and left wholly unrebutted, the court affirmed the order compelling disclosure. *Id.*[29]

---

[29]    Notably, in 2002, the New York legislature explicitly rejected the fiduciary exception as applied to estate law, declaring:

> (i) No beneficiary of the estate is, or shall be treated as, the client of the attorney solely by reason of his or her status as beneficiary;
>
> (ii) The existence of a fiduciary relationship between the personal representative and a beneficiary of the estate does not by itself constitute or give rise to any waiver of the privilege for confidential communications made in the course of professional employment between the attorney or his or her employee and the personal representative who is the client;
>
> (iii) The fiduciary's testimony that he or she has relied on the attorney's advice shall not by itself constitute such a waiver.

N.Y.C.P.L.R. § 4503(a)(2)(A). *But see Estate of Barbano v. White*, 2004 WL 3211546, *2 (N.Y. Sup. Ct. Oct. 19, 2004) (unreported) (applying the fiduciary exception with a showing of good cause and holding that the attorney-client "privilege must yield to plaintiff's greater interest in discovering what actions were taken on the Barbanos' behalf and in the guise of protecting their interests"). As in New York, the legislatures of South Carolina and Florida overrode lower court decisions recognizing a common-law fiduciary exception in 2008 and 2011, respectively. *Compare Floyd v. Floyd*, 615 S.E.2d 465 (S.C. Ct. App. 2005), *and Jacob v. Barton*, 877 So.2d 935 (Fla. Dist. Ct. App. 2004)*, with* S.C. Code Ann. § 62-1-110, *and* Fla. Stat. § 90.5021(2) (2011).

By the mid-1990s, adoption of the fiduciary exception had stalled, and a rapid succession of state court decisions, rule changes, and statutory amendments turned the tide against recognizing that exception as applied to trusts. In 1994, the Supreme Judicial Court of Massachusetts declined "[t]o impose a [fiduciary] duty on a trustee's attorney to beneficiaries," which it feared "could create situations antithetical" to disciplinary rules requiring the preservation by attorneys of "secrets and confidences gained in the course of representing a client." *Spinner v. Nutt*, 631 N.E.2d 542, 545 (Mass. 1994). One year later, Hawai'i's probate court rules were amended to provide that "[a]n attorney employed by a fiduciary for an estate, guardianship, or trust represents the fiduciary as client," not the estate's beneficiaries. Haw. R. Probate 42(a).

The following year, the Supreme Court of Texas held that communications between a trustee and the trustee's attorney retain the full protection of the attorney-client privilege, despite the trustee's fiduciary duty to the beneficiary. *Huie v. DeShazo*, 922 S.W.2d 920, 925 (Tex. 1996) (holding that "the trustee who retains an attorney to advise him or her in administering the trust is the real client, not the trust's beneficiaries"). In 2000, the Supreme Court of California similarly held that the privilege protects the trustee rather than the beneficiary, concluding that "the trustee's reporting duties do not trump the attorney-client privilege." *Wells Fargo Bank v. Sup. Ct.*, 990 P.2d 591, 597 (Cal. 2000). The Supreme Court of Nevada rejected the exception most recently, concluding that it did not fall within one of the "five specifically defined exceptions to the attorney client privilege" under Nevada law. *Canarelli v. Eighth Judicial Dist. Ct. in and for Cty. of Clark*, 464 P.3d 114, 121 (Nev. 2020). It must be noted, however, that these courts predicated their decisions upon the existence of statutes codifying both the privilege and

its recognized exceptions.[30]  Because those statutes did not list the fiduciary-beneficiary relationship as one such exception, the courts declined to recognize one by judicial fiat.[31]

Capped by *Canarelli*, the last decade has witnessed the high courts of Nevada and Georgia, and lower courts in Alabama, Illinois, Connecticut, and Virginia, reject the fiduciary exception outright, either because recognition was foreclosed by statute or

---

[30]  *See Wells Fargo*, 990 P.2d at 595 ("[T]hose courts [that have adopted the fiduciary exception] consider themselves free, in a way we do not, to create exceptions to the privilege."); *Huie*, 922 S.W.2d at 924-25 ("Rule 503 [of the Texas Rules of Evidence] contains no exception applicable to fiduciaries and their attorneys.  If the special role of a fiduciary does justify such an exception, it should be instituted as an amendment to Rule 503 through the rulemaking process.").

[31]  In *dicta*, the *Wells Fargo* Court articulated why, despite its apparent lack of authority, it would not recognize a fiduciary exception even if it could.  First, the Court explained that "material fact[s]" about trust management could always be obtained through discovery in the event of disputes between beneficiaries and trustees.  990 P.2d at 597 n.2 (quoting *Huie*, 922 S.W.2d at 923).  Second, the Court dismissed the "joint client" rationale relied upon by the Supreme Court of Arkansas.  "Because no such relationship is implied in law," its existence "(and its propriety under the rules prohibiting conflicts of interest) would have to be determined on the facts of each individual case." *Id.* at 598.  And finally, the Court emphatically rejected the notion that "[p]ayment of fees" from the trust corpus *ipso facto* "determine[s] ownership of the attorney-client privilege." *Id.*

Of significance to that last point, the Court noted that "under California law, a trustee may use trust funds to pay for legal advice regarding trust administration and may recover attorney fees and costs incurred in successfully defending against claims by beneficiaries." *Id.* at 599 (citations omitted).

> When the law gives the trustee a right to use trust funds, or to reimbursement, the funds do not in law belong to the beneficiaries. Conversely if the trustee's expenditures turn out to have been unauthorized, the beneficiaries may ask the probate court to surcharge the trustee.  But this question of cost allocation does not affect ownership of the attorney-client privilege.

*Id.*  In brief, the Court reasoned that "[t]o the extent the source of payment has any significance, it is but one indicium in determining the existence of an attorney client relationship and, thus, who holds the privilege." *Id.* at 598 (citation omitted); *see id.* at 598-99 ("[T]he assumption that payment of legal fees by the trust is equivalent to direct payments by beneficiaries is of dubious validity.").

because it was believed to undermine the policy of free and open communications between trustees and counsel promoted by the privilege.[32] One noteworthy exception to this trend came from the Supreme Court of Arizona, which adopted a limited fiduciary exception pursuant to its constitutional powers "to apply exceptions to the attorney-client privilege in the absence of legislative action." *See In re Kipnis Section 3.4 Trust*, 329 P.3d 1055, 1061 (Ariz. 2014) (citing, *inter alia*, *Huie*, 922 S.W.2d 920). Specifically, the *Kipnis* Court held that a trustee owes "a duty to disclose 'legal consultations and advice obtained in the trustee's fiduciary capacity concerning decisions or actions to be taken in the course of administering the trust.'" *Id.* at 1061 (quoting RESTATEMENT (THIRD) OF TRUSTS § 82, cmt. f (2007)). Departing from the *Wells Fargo* analysis, the court agreed that a trustee may not withhold "material facts from a beneficiary simply because the trustee has communicated those facts to an attorney." *Id.* However, citing language in Comment f, the court clarified that "whether the trustee acted in a fiduciary capacity cannot be resolved simply by asking who paid for the advice." *Id.* at 1062.

### C.

With this survey in mind, we must now call the question on the instant appeal. Trustee implores us not to recognize a fiduciary exception to the attorney-client privilege. He asserts that an order compelling the disclosure of unredacted attorney invoices would

---

[32] *See St. Simons Waterfront LLC v. Hunter MacLean Exley & Dunn, P.C.*, 746 S.E.2d 98 (Ga. 2013); *Caplan v. Benator*, 262 So.3d 672 (Ala. Civ. App. 2018); *Garvey v. Seyfarth Shaw LLP*, 966 N.E.2d 523 (Ill. App. 2012); *Hubbell v. Ratcliffe*, 50 Conn. L. Rptr. 856, 2010 WL 4885631, *4-5 (Conn. Super. Ct. Nov. 8, 2010) (unreported); *Batt v. Manchester Oaks Homeowners Assoc., Inc.*, 80 Va. Cir. 502, 2010 WL 7371240, *3 (Va. Cir. Ct. July 6, 2010) (unreported); *see also Murphy v. Gorman*, 271 F.R.D. 296, 318 (D.N.M. 2010) (stating the court's "belie[f] that the Supreme Court of New Mexico would not permit a judicially-created expansion of the exceptions to the attorney-client privilege to add a fiduciary exception, which has not been recognized in the New Mexico Constitution or in the New Mexico Rules of Evidence").

reveal legal advice and strategy in violation of the privilege. Pointing to the privilege's codification at 42 Pa.C.S. § 5928,[33] which contains no such explicit exception, Trustee suggests that this Court should defer to the General Assembly to consider whether one should be adopted and, if so, the contours of its protections. Trustee's Brief at 23-24. Trustee stresses that there should be a strong presumption against fashioning exceptions, lest the very concerns that animated the common-law privilege be drowned out by a proliferation of legal actions against fiduciaries. *Id.* at 27-28. Even if a narrow exception could be crafted for adversarial proceedings, Trustee claims that "communications will still be chilled," undermining the privilege as a whole. *Id.* at 28.[34]

Beneficiaries, conversely, contend that Pennsylvania law entitles them to access records regarding trust management.[35] They posit that this duty naturally includes

---

[33] Section 5928 provides:

> In a civil matter counsel shall not be competent or permitted to testify to confidential communications made to him by his client, nor shall the client be compelled to disclose the same, unless in either case this privilege is waived upon the trial by the client.

42 Pa.C.S. § 5928.

[34] The Pennsylvania Bankers Association ("PBA") filed a brief as *amicus curiae* on behalf of Trustee raising many of the same arguments. Additionally, PBA contends that its members—corporate fiduciaries, who often serve as co-trustees—at times may need to seek legal advice regarding whether the conduct of another co-trustee raises concerns about compliance with fiduciary duties, perhaps rising to a level requiring removal. If such consultation is subject to disclosure to beneficiaries, PBA claims, a co-trustee might be deterred from seeking such advice in the first place, redounding to a beneficiary's ultimate detriment. The fact of the inquiry and analysis, they say, could poison the atmosphere among co-trustees and between trustees and beneficiaries. PBA's Brief at 6-7. Beneficiaries respond that *amicus*' "real fear" is that banks "will have to show their work and will have to disclose all of their fees." Beneficiaries' Brief at 20. That is why, Beneficiaries claim, *amicus* prefers a rule "that ratifies a self-serving preference to work without restraint, without complete transparency, and therefore without complete accountability." *Id.*

[35] *See* Beneficiaries' Brief at 9 (citing 20 Pa.C.S. § 7772 (trustee "shall administer the trust solely in the interests of the beneficiaries"); *id.* § 7780 (trustee "shall keep adequate

---

disclosures pertinent to fees paid from the trust, like the billing statements at issue here. Beneficiaries' Brief at 20. At base, Beneficiaries submit that Trustee's position, were it to prevail, essentially would force them to cover attorney fees for legal work the reasonableness of which they would have no way of assessing. Absent some mechanism for reviewing the stated justification for the work and whether the amount paid was appropriate, Beneficiaries fear that the trust established for their benefit could be raided via disbursement of questionable, yet unverifiable, legal expenses.

In Beneficiaries' view, Judge Wettick's opinion in *Follansbee*, from which the Superior Court drew in this case, offers a studied approach to balancing the competing interests in trust administration. We agree. Like this case, *Follansbee* involved a trustee who invoked the attorney-client privilege in order to withhold from a beneficiary communications between the trustee and counsel regarding management of a trust. Plaintiffs, the beneficiaries of a trust who brought suit against trust counsel (attorneys at Reed Smith LLP), served a subpoena to produce documents upon the non-party trustee, PNC Bank. In response, PNC withheld, on grounds of attorney-client privilege, certain communications its employees had with attorneys at the law firm regarding trust administration. Before the trial court was the beneficiaries' motion to overrule the trustee's objections to the subpoena.

Relying upon *Riggs* and Section 173 of the Second Restatement of Trusts, Judge Wettick ruled that the withheld documents must be produced, concluding that a "trustee cannot withhold from any beneficiary documents regarding management of the trust including opinions of counsel procured by the trustee to guide the trustee in the administration of the trust, because trust law imposes a duty to make these documents

---

records of the administration"); *id.* § 7780.3 (trustee "shall promptly respond to a reasonable request by . . . a beneficiary . . . for information related to the trust's administration")).

available to the beneficiaries." *Follansbee*, 56 Pa. D. & C. 4th at 491; *see id.* at 487-88 (quoting 2A A. SCOTT & W. FRATCHER, SCOTT ON TRUSTS § 173 (4th ed. 1987) ("A beneficiary is entitled to inspect opinions of counsel procured by the trustee to guide him in the administration of the trust.")). In reaching this result, the court differentiated between information regarding trust administration paid for out of the trust corpus, and "legal advice procured at the trustee's own expense and for his own protection," which remains protected from disclosure. *Id.* at 490. Most importantly for our present discussion, Judge Wettick recognized that Pennsylvania's attorney-client privilege, much like Delaware's, remains rooted in principles of the common law.

In *Rosenblum*, we announced that Section 173 of the Second Restatement was "declaratory of the common law of Pennsylvania." 328 A.2d at 165. Section 173 of that treatise—which this Court has not disavowed—defines the scope of the trustee's duty to furnish information:

> The trustee is under a duty to the beneficiary to give him upon his request at reasonable times complete and accurate information as to the nature and amount of the trust property, and to permit him or a person duly authorized by him to inspect the subject matter of the trust and the accounts and vouchers and other documents relating to the trust.

RESTATEMENT (SECOND) OF TRUSTS § 173 (1959). Comment b to Section 173, upon which Judge Wettick focused in his analysis, further explains:

> *What need not be communicated.* The trustee is privileged to refrain from communicating to the beneficiary information acquired by the trustee at his own expense and for his own protection. Thus, *he is privileged to refrain from communicating to the beneficiary opinions of counsel obtained by him at his own expense and for his own protection*.

*Id.* cmt. b (latter emphasis added). By its plain terms, the Second Restatement provides that trustees may avoid disclosure of legal opinions so long as they personally cover their own legal expenses. More than a half-century later, that remains our understanding of

the common-law confines of the attorney-client privilege in disputes between fiduciaries and beneficiaries.

Interestingly, both parties also claim the benefits of Section 82 of ALI's Third Restatement, which revised and expanded upon Section 173's subject matter. Both point to Comment f, reproduced below, asserting that this provision encapsulates Pennsylvania law and should control:

> *What need not be disclosed?* A trustee is privileged to refrain from disclosing to beneficiaries or co-trustees opinions obtained from, and other communications with, counsel retained for the trustee's personal protection in the course, or in anticipation, of litigation (e.g., for surcharge or removal). This situation is to be distinguished from legal consultations and advice obtained in the trustee's fiduciary capacity concerning decisions or actions to be taken in the course of administering the trust. Communications of this latter type are subject to the general principle entitling a beneficiary to information that is reasonably necessary to the prevention or redress of a breach of trust or otherwise to the enforcement of the beneficiary's rights under the trust.
>
> When the roles and objectives of legal consultation are unclear, the question of who has paid for the legal services, or who ultimately will be required to pay those expenses, although potentially relevant, involves other and complicated considerations (see § 88 [("Power to Incur and Pay Expenses")]) so that this matter is not determinative in resolving issues of privilege. . . .

RESTATEMENT (THIRD) OF TRUSTS § 82, cmt. f (2007). This iteration of the common-law exception for fiduciaries—which this Court has not adopted—differs from the Second Restatement insofar as the source of funds would no longer be dispositive of questions regarding disclosure. *See Kipnis*, 329 P.3d at 1062. Because this latter-day formulation would increase uncertainty with regard to disclosure disputes in probate matters rather than diminish it, we would reject the parties' entreaty, and we would reaffirm the core holding of *Rosenblum*.

While we appreciate the concerns that animated many jurisdictions' retreat from the fiduciary exception over the past quarter century, we would stand fast. Transparency

remains the cornerstone of the fiduciary duty. Because trustees in essence serve as proxies for trust beneficiaries, their fiduciary duties compel them always to act in accordance with the latter's best interests in mind. To the extent that the attorney-client privilege obscures that fundamental obligation by frustrating beneficiaries' entitlement to information about trust management, the privilege must yield. As with all considerations of restrictions on attorney-client confidentiality, predictability is critical. Indeed, a categorical approach for fiduciaries akin to that expounded in *Riggs* would bring greater clarity to the parameters of Pennsylvania's common-law privilege within the law of trusts. *See Upjohn*, 449 U.S. at 393 ("An uncertain privilege . . . is little better than no privilege at all."); *accord Jaffee v. Redmond*, 518 U.S. 1, 18 (1996); *Ziegler*, 200 A.3d at 80. A categorical approach, moreover, would produce additional "benefits, including easier application in our lower courts" and "predictability[] and notice" to trustees and beneficiaries alike. *Commonwealth v. Britton*, 229 A.3d 590, 618 (Pa. 2020) (Wecht, J., concurring).

To that end, we would hold that, where legal counsel is procured by a trustee utilizing funds originating from a trust corpus, the beneficiaries of that trust are entitled to examine the contents of communications between the trustee and counsel, including billing statements and the like. That examination necessarily includes reviewing the contents of invoices in order to determine precisely what was procured with trust funds where the reasonableness of costs is at issue. The attorney-client privilege and work product doctrine cannot shield those disclosures in this Commonwealth. To hold otherwise would enable fiduciaries to weaponize trust assets reserved for beneficiaries against those very beneficiaries in litigation over the propriety of trust management. Since those same beneficiaries simultaneously would be obliged to foot their own legal bills, they would, in essence, be paying for both parties' lawyers. That result is untenable,

particularly in a case such as this, where Trustee also is a co-beneficiary of the trust established by his late father for the benefit of Trustee and his step-siblings.[36]

---

[36] While Justice Donohue agrees that this Court is empowered to resolve the question of the fiduciary exception's applicability in this Commonwealth, OSR at 13 n.9, she would answer that question in the negative. In doing so, Justice Donohue suggests that trustees in "many, if not the vast majority of private trusts . . . will be an average person who has or had a personal relationship with the trustor." *Id.* at 9. By way of example, she invokes a hypothetical yeoman farmer who selects from his rancorous offspring a daughter to administer trust assets, including potentially valuable gas rights. *Id.* at 9-10. While the learned Justice's ode to a Jeffersonian paradigm, where trusts principally were used as conveyance devices "to facilitate the transfer of freehold land within the family," may have been apt in the early years of a fledgling nation reliant upon an agrarian economy, *see* John H. Langbein, *The Contractarian Basis of the Law of Trusts*, 105 YALE L.J. 625, 632 (1995), it overlooks the reality of trust administration in the twenty-first century, in which sophisticated intermediaries like trust companies—*i.e.*, large financial institutions and law firms (with their attendant fee schedules)—have proliferated and predominate. *See, e.g.*, John H. Langbein, *The Secret Life of the Trust: The Trust as an Instrument of Commerce*, 107 YALE L.J. 165, 178 (1997) (citing publicly available regulatory agency data "on the assets held by trust companies and other institutional trustees" in support of assertion "that well above 90% of the wealth in trust in the United States is held in commercial as opposed to personal trusts"; observing that "[t]he use of individual trustees is quite common in family wealth transmission, but mostly in smaller trusts"); Ugo Mattei & Henry Hansmann, *Trust Law in the United States. A Basic Study of Its Special Contribution*, 46 AM. J. COMP. L. SUPP. 133, 133 (1998) (noting "the enormous—though commonly neglected—role that private trusts have come to play in the American capital markets").

Additionally, relying upon the Uniform Trust Act, 20 Pa.C.S. §§ 7701 *et seq.*, Justice Donohue further contends that trustees' "right to use corpus funds both for the administration of the trust and for reimbursement of expenses incurred in connection therewith" implicitly means that, whatever funds beneficiaries may be entitled to, "they are the funds exclusive of those that are necessary to properly administer the trust as deemed reasonably necessary by the trustee in her professional judgment." OSR at 8. But that view begs the principal question of reasonableness—to say nothing of necessity. Consider the present dispute, which centers upon the propriety of the attorney fees themselves, rather than any given administrative decision undertaken upon the advice of counsel. Here, Trustee managed to accrue nearly $125,000 in attorney fees in less than two years of administering the trust. According to the first and partial accounting, that amount is roughly one-tenth of the total outlays (approximately $1.5 million) distributed from the trust principal prior to February 1, 2014. An additional $220,000 has been disbursed to Gray and K&L Gates in attorney fees since that date, per the second and final accounting. Whether those expenses were reasonable remains to be adjudicated in future proceedings. But the fact that their very existence served to significantly deplete

Here, Trustee disclosed that he had spent more than $123,000 from the trust for attorney fees and costs between February 2014 and December 2015, prompting the probate court to freeze further disbursements of trustee and legal fees from the trust estate without prior approval. Trustee then produced heavily redacted billing statements that shed no light upon why he sought those services and whether the outlays were consistent with his fiduciary obligations. Although Trustee's suggestion that the probate court examine the uncensored documents *in camera* might be appropriate in other contexts, it is unavailing here. Beneficiaries bear the initial burden of proving that trust expenditures are unreasonable. That burden cannot simply be shifted onto the probate courts of this Commonwealth by resort to *in camera* expeditions. Accordingly, Beneficiaries require access to those unredacted billing statements to substantiate their claims.

Nothing in our proposed disposition would curtail the ability of trustees to seek remuneration for expenses reasonably incurred in the course of trust management. To the extent that trustees wish to maintain the confidentiality of their communications with counsel, we would find that Pennsylvania law already offers a simple solution: do so at your own expense. We would uphold the trial court's discovery order for the foregoing reasons. Because the Court presently is divided on whether the fiduciary exception should be recognized in this Commonwealth, however, resolution of that issue must await another day.

the trust corpus—from which, Justice Donohue acknowledges, Beneficiaries are *entitled* to derive an equitable benefit, *id.* (citing *Lewis v. Alexander*, 685 F.3d 325, 332 (3d Cir. 2012))—is demonstrable on its face. In focusing upon the potential administrative obligations that might beset trustees with the adoption of the fiduciary exception, the OSR fails to consider that it is beneficiaries' burden in all instances to prove that trust expenditures are unreasonable. How else can Trustee's "professional judgment" in maintaining not one, but two evidently well-compensated law firms adequately be probed in this particular context other than by examining the contents of the heavily redacted billing statements? Justice Donohue offers no viable alternative.

Justices Todd and Dougherty join this opinion.

Justices Saylor, Donohue and Mundy join Parts I and II(A) of the opinion.

Justice Saylor files a concurring opinion and opinion supporting reversal.

Justice Donohue files a concurring opinion and opinion supporting reversal in which Justice Mundy joins.

Chief Justice Baer did not participate in the consideration or decision of this matter.